*EXH*

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CALL CENTER TECHNOLOGIES, INC., | : | CIVIL ACTION NO. 3:03CV1036 (DJS) |
| Plaintiff, | : | |
| v. | : | |
| GRAND ADVENTURES TOUR & TRAVEL PUBLISHING CORPORATION, INTERLINE TRAVEL & TOUR, INC., | : : | |
| Defendants. | : | February 15, 2006 |

## THIRD AMENDED COMPLAINT

NOW COMES the Plaintiff, Call Center Technologies, Inc. ("CCT"), as and for its Third Amended Complaint against Grand Adventures Tour & Travel Publishing Corporation, and Interline Travel & Tour, Inc., complains and states:

### I.  The Parties

1.      Plaintiff CCT is a Delaware corporation with a prinpipal place of business located at 632-640 Federal Road, Brookfield CT 06804.   At all relevant times, Plaintiff has had and continues to maintain a principal place of business at its Connecticut address.

2.      Defendant Grand Adventures Tour & Travel Publishing Corporation is and/or was a Texas corporation, with a place of business located at 211 East 7th Street, Southwest Tower, 11th Floor, Austin, Texas 78701.

3.      Defendant Interline Travel & Tour, Inc. is a Texas corporation with a former place of business located at 211 East 7th Street, Southwest Tower, 11th Floor, Austin, Texas, 78701, and a present place of business located at 12708 Riata Vista Circle, Suite A-125, Austin TX 78727.

4.      Defendant Grand Adventures Tour & Travel Publishing Corporation did business under the name(s) of, among others, "GATT," "Grand Adventures Tour & Travel, Inc.", "Airfare Publishing," "Interline Adventures," "Interline Travel", "Interline Travel Reps," "Interline Travel & Tours," and "Perx.COM", all hereafter referred to as "GATT."

5.      Defendant Interline Travel & Tour, Inc., ("Interilne") does business under the name(s) of, among others, "Interline Vacations" and "Perx.COM," conducts business with Connecticut residents, ships goods into Connecticut, and maintains continuous and systematic sales and marketing with Connecticut residents.

## II.   The State Court Proceedings

6.      On or about August 27, 2002 the Plaintiff commenced an action against GATT based upon breach of contract for non-payment of goods sold, which was filed in the Superior Court, Judicial District of Danbury, Connecticut, docketed as case number CV-02-0346965-S (the "State Court Proceeding"). The underlying written agreement forming the basis of the State Court Proceeding is attached hereto and made a part hereof as Exhibit A (the "Agreement").

7.      After GATT failed to appear or plead in the State Court Proceeding, a default was entered against GATT in the State Court Proceeding.

2

8.     On or about April 21, 2003, Connecticut Superior Court Judge White granted the Plaintiff's motion to cite-in Defendant Interline Travel & Tour, Inc., as a party defendant in the State Court Proceeding.

9.     On or about May 12, 2003 Plaintiff amended its Complaint in the State Court Proceeding, making the Defendant Interline Travel & Tour, Inc. a party defendant.

10.    On or about June 3, 2003, the Defendant Interline Travel & Tour, Inc., appeared in the State Court Proceeding, and on June 10, 2003 filed a Notice of Removal to the United States District Court for the District of Connecticut.

11.    On or about August 20, 2003, the Plaintiff amended its Complaint filed in this Court (the "Second Amended Complaint").

## III.  Subject Matter Jurisdiction & Venue

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13.    Venue is proper in the District of Connecticut because the Agreement provides that it shall be governed and enforceable by the laws of the State of Connecticut (Agreement at ¶ 18), the Plaintiff maintains a place of business in Connecticut and elected to file its action within the State of Connecticut, the Defendant Interline Travel & Tour, Inc. elected to remove this case to this District from the Connecticut Superior Court, and because a substantial part of events giving rise to this action occurred in the District of Connecticut.

## IV.  Allegations Common to All Counts

### The Transactions Between CCT and GATT

14.    Pursuant to the Agreement, GATT purchased from the Plaintiff certain telecommunications goods called an Aspect Call Center.  An Aspect Call Center is used by companies with live-operator call centers in order to receive a large volume of incoming telephone calls, as with an airline or hotel reservations department.

15.    Most of GATT's sales took place over the telephone through incoming telephone calls to its "1-800" telephone numbers, which were answered by telephone representatives working in GATT's call center(s).

16.    GATT offered discount travel packages to active and retired airline employees, such individuals being commonly referred to in the travel industry as "interliners."

17.    GATT's call center representatives answered GATT's "1-800" telephone numbers with the names "Interline,"  "Interline Travel," and "Interline Travel Reps."

18.    GATT published, among other things, a publication referred to as the "Interline brochure" or "Interline Update," which it mailed and emailed to its' customers on GATT's internal customer lists.

19.    GATT also published and maintained an interactive internet web site, known as perx.com, where it advertised travel packages, signed-up new customers / members for its discount travel program, and distributed its publications including the "Interline brochure."

20.    GATT offered and solicited through the perx.com web site, Connecticut residents to sign-up for membership in GATT's discount travel program.

4

21.    GATT also offered and solicited through the perx.com web site, individuals affiliated with Bradley International Airport in Hartford, Connecticut, as well as Tweed Regional Airport in New Haven, Connecticut, to sign-up for membership in GATT's discount travel program.

22.    During the negotiations between the parties for the purchase of the Aspect Call Center, Plaintiff placed and received phone calls and faxes at Plaintiff's Brookfield, Connecticut offices regarding the contemplated Agreement with Defendant GATT.

23.    Correspondence between the parties and their agents was sent to, and by Plaintiff from, Plaintiff's Brookfield, Connecticut offices.

24.    Plaintiff sent the Agreement without signature from its Brookfield, Connecticut offices to the Defendant GATT in Texas.

25.    Defendant GATT returned the Agreement to Plaintiff's Connecticut offices executed by its C.E.O. Matthew O'Hayer, where it was then executed by Plaintiff.

26.    At the time which GATT returned the executed Agreement to Plaintiff in Connecticut, GATT also remitted an initial deposit called for under the Agreement in the form of a check drawn upon a bank account of Grand Adventures Tour & Travel Publishing Corporation, in the amount of $35,000.00 (Exhibit B hereto).

27.    The Aspect Call Center was shipped by Plaintiff from Brookfield, Connecticut.

28.    All invoices for product delivered were sent by Plaintiff from its Brookfield, Connecticut office.

29.    The Agreement states that it will be governed by and enforceable under the laws of the State of Connecticut. The terms of the Agreement state that it will be binding upon both parties and their successors. (Agreement attached as Exhibit A hereto at ¶ 18).

5

30.    Defendant GATT ordered additional parts from Plaintiff in February, 1999 consisting of two (2) Aspect Teleset Interface Cards, part number 4061, and three (3) Aspect Teleset Interface Cables, which Plaintiff supplied to GATT, shipping them from its Brookfield, Connecticut offices.

31.    The purchase price under the Agreement of the Aspect Call Center was $136,090.00, of which GATT paid a deposit of $35,000.00 upon its execution of the Agreement, resulting in an original net balance due of $106,090.00 as of November 30, 1998.

32.    The purchase price of the additional parts is $13,990.00, of which GATT did not make any payment, resulting in an original net balance due for the additional parts of $13,990.00 as of February 28, 1999.

33.    Although demand for payment was made, Defendant GATT refused and neglected to pay Plaintiff.

34.    Defendant GATT nor Defendant Interline ever returned to Plaintiff either the Aspect Call Center or the additional parts. GATT used both the Aspect Call Center and the additional parts for approximately one year. Subsequently, Defendant GATT or Defendant Interline sold the Aspect Call Center and additional parts for an unknown amount.

## GATT Gives an Undisclosed Security Interest in 100% of GATT's Assets
## to Duane K. Boyd & Lawrence K. Fleischman

35.   GATT's stock was publically traded on multiple stock exchanges and on pink sheets.

36.   On or about April 17, 2000, GATT filed a form 10-K with the United States Securities and Exchange Commission, S.E.C. File Number 33-4734-D (the "Form 10-K"). In the Form 10-K, GATT stated that it's executive officers and directors, entities affiliated with them and employees of GATT and holders of at least 5% (five percent) of GATT's outstanding common stock affiliated with the executive officers and directors, will beneficially own shares of common stock of GATT representing more than 29% (twenty-nine percent) of the total voting power of GATT common stock, and that these persons if acting in concert, will be able to exercise control over the Company's affairs, and are likely to be able to control the Board of Directors and the disposition of any matter submitted to a vote of stockholders.

37.   The Form 10-K listed among GATT's directors, executive officers, promoters and control persons: (a) Matthew O'Hayer, Chairman & Chief Executive Officer; (b) Joseph S. Juba ("Juba"), President and Chief Operating Officer; ( c) Fernando Cruz Silva ("Cruz Silva"), Senior Vice President of Sales & Marketing; (d) Patti Macchi ("Macchi"), Vice President of Cruise Sales & Marketing; (e) Duane K. Boyd, ("Boyd") Director.

38.   Each of the above individuals later became either an employee, director, officer, promoter, shareholder or otherwise affiliated with the Defendant Interline.  Three additional individuals were identified in the Form 10-K as GATT control persons which did not become affiliated with the Defendant Interline after terminating their relationship with GATT.

39.     On or about August 15, 2000, GATT filed a form 10-QSB with the S.E.C.for the quarterly period ended June 30, 2000, stating therein that GATT, together with it's wholly owned subsidiary, Grand Adventures Tour & Travel (UK) Limited, an English corporation ("GATT U.K."), then had total assets amounting to $8,963,160 (eight million, nine-hundred sixty-three thousand, one-hundred sixty dollars), U.S.

40.     On or about November 21, 2000, GATT filed a form 10-QSB with the S.E.C., for the quarterly period ended September 30, 2000, and stated therein that GATT, together with GATT U.K., then had total assets amounting to $12,683,090 (twelve million, six-hundred eighty-three thousand ninety dollars), U.S.   Of these GATT assets, GATT identified $1,724,114 (one million, seven-hundred twenty-four thousand, one hundred and fifteen dollars), U.S., of assets as property and equipment, at cost, net of accumulated depreciation, as well as $1,105,369 (one million, one-hundred five thousand, three-hundred sixty-nine dollars), U.S., as intangible assets, net of accumulated amortization.

41.     No subsequent form 10-QSB was filed with the S.E.C. by GATT, nor was the November 21, 2001 form 10-QSB ever amended.

42.     Within six months of the filing of the November 21, 2001 form 10Q-SB indicating that it had assets in excess of $12 million dollars, GATT allegedly sought to obtain a total of $170,000 (one hundred seventy thousand dollars U.S.) of financing in the form of revolving lines of credit from two individuals which had acted as consultants to GATT, one of whom was also a director of GATT, and both of whom possessed inside information as to GATT's affairs and its assets.

8

43.    Specifically, on or about May 24, 2001, Duane K. Boyd, then a director and shareholder of GATT, and Lawrence K. Fleischman ("Fleischman"), executed certain loan documents with GATT, which were signed by Joseph S. Juba as President of GATT. At that time, Fleischman was a shareholder of GATT, as well as a "consultant" to GATT. He attended GATT board of directors meetings, although he was not a director, and is presently the Chairman and Chief Executive Officer of Interline.

44.    On or about June 15, 2001, GATT filed a Form 8-K with the S.E.C., stating through it's President Joseph S. Juba, among other things, that: (1) on June 2, 2001, Mr. Joseph S. Juba, the Company's President and Chief Operating Officer, was appointed to GATT's Board of Directors; (2) on June 2, 2001, Mr. Duane K. Boyd, Jr. resigned from his position on GATT's Board of Directors, Audit Committee and Compensation Committee; (3) on June 14, 2001, Mr. Matthew O'Hayer, GATT's Chairman of the Board and Chief Executive Officer, resigned his position as Chief Executive Officer, but would remain as Chairman of the Board; (4) on June 14, 2001, Mr. Matthew O'Hayer also entered into a consulting agreement with GATT, and would receive future compensation in the form of cash, or at GATT's sole option, common stock based upon the future stock price of GATT's common stock, and (5) on June 14, 2001, Mr. Matthew O'Hayer also entered into a loan agreement to provide an unsecured line of credit to GATT over the next year, with the maximum available borrowings under the line of credit being $50,000.00.

45.    In Item 9 (Nine) - Regulation FD Disclosure, of the same June 15, 2001 Form 8-K, GATT further stated through its President Joseph S. Juba that: (1) Mr. Duane K. Boyd, Jr. and "another individual" which was unnamed, effective April 1, 2001, entered into a consulting agreement with GATT, and that they would receive no immediate compensation from such

9

agreements, but rather they will receive future compensation in the form of cash, or at GATT's sole option, common stock based upon the future stock price of GATT's common stock, and (2) that on May 24, 2001, Mr. Duane K. Boyd, Jr., and the same unnamed individual, entered into loan agreements to provide two lines of credit to GATT over the next year; that the maximum available borrowings under these lines of credit total $170,000; and that the lines of credit are secured by the stock of GATT's 100% owned subsidiary, GATT U.K.

46.    The unnamed "individual" referenced in the June 15, 2001 Form 8-K was Lawrence K. Fleischman.

47.    The June 15, 2001 Form 8-K was the last public filing of any sort made by GATT with the S.E.C.

48.    **The only collateral disclosed in the June 15, 2001 Form 8-K was 65% (sixty-five percent) of the capital stock of GATT U.K.**

49.    Approximately one month after filing it's last public disclosure with the S.E.C., GATT, by its President Joseph S. Juba, who at that time was also the Chief Operating Officer of GATT as well as a director of GATT, executed a second set of loan documents between GATT, Duane K. Boyd, and Lawrence K. Fleischman, all dated July 18th, 2001.

50.    The July 18, 2001 loan documents include two "Promissory Note" agreements which purport to evidence lines of credit granted to GATT by Duane K. Boyd and Lawrence K. Fleischman, in the amounts of $100,000.00 (one hundred thousand dollars) each.  In addition, GATT entered into a third agreement, i.e., a July 18, 2001 Security Agreement with Duane K. Boyd and Lawrence K. Fleischman.

51.    The July 18, 2001 Security Agreement stated that among the indebtedness and obligations secured thereby, were all debts and liabilities arising under the May 24, 2001 loan documents (which had been disclosed in the June 15, 2001 Form 8-K filed with the S.E.C.), as well as the contemporaneously executed July 18, 2001 Promissory Notes.

52.    The July 18, 2001 Security Agreement purported to grant Boyd and Fleischman as collateral for such indebtedness and obligations, **a security interest in 100% (one hundred percent) of GATT's assets**, of any kind, subject to any prior liens.  The only substantial prior lien held against GATT's assets relative to the value of GATT's assets was a lien held by Wells Fargo bank, for $166,000.00 (one hundred sixty six thousand dollars).

53.    On or about August 8, 2001, Joseph S. Juba, as President of GATT, filed certain financing statements with the Texas Secretary of State, describing therein the collateral referred to in the July 18, 2001 Security Agreement (i.e., all of GATT's assets), and thereby purporting to perfect the security interests of Boyd and Fleischman in all of GATT's assets.

54.    Neither the July 18, 2001 loan documents, the Security Agreement, the financing statements, nor the terms and conditions of same, were ever disclosed by GATT, Joseph S. Juba, Duane K. Boyd, or Lawrence K. Fleishman to the S.E.C., nor otherwise to the public, GATT's shareholders or creditors generally, nor was the June 15, 2001 Form 8-K ever amended.

55.    At no time either prior or subsequent to executing the July 18, 2001 Security Agreement with Fleischman and Boyd did Joseph S. Juba, acting as President, Chief Operating Officer, and a director of GATT, take any steps whatsoever to ascertain the value of GATT's assets which Fleischman and Boyd were thereby being granted a security interest in, nor did he consult with GATT's accountants, nor did he prepare any itemized list of any specific GATT assets that were made subject to those security interests.

11

### The Formation of Interline Travel & Tour, Inc.
### & The Undisclosed Foreclosure "Auction"

56.     On or about October 9, 2001, Duane K. Boyd, and Lawrence K. Fleischman,

through their mutual attorney Timothy C. Taylor of Jackson & Walker, L.L.P., each sent by

certified mail to GATT, attention to Joseph S. Juba, a "Notice Of Intent to Accelerate And

Demand Payment."

57.     The above October 9, 2001 Notice stated that GATT, as borrower under the May

24, 2001 and July 18, 2001 promissory notes / lines of credit, had defaulted on same, and that

Boyd & Fleischman intended to accelerate the maturity of same if all existing defaults were not

cured by 5:00 pm on October 19, 2001.  This Notice further stated that Boyd & Fleischman

intended to exercise their rights and remedies under the July 18, 2001 Security Agreement, and

may elect to repossess some or all of the collateral thereunder (i.e., all of GATT's assets), and in

which event any such collateral repossessed would be sold by public or private sale in accordance

with the terms and conditions of the Security Agreement and the Texas U.C.C.

58.     Neither the above October 9, 2001 Notice of Intent to Accelerate and Demand

Payment, nor its terms and conditions, was ever disclosed by GATT, Joseph S. Juba, Duane K.

Boyd, or Lawrence K. Fleischman to the S.E.C., nor otherwise to the public, GATT's

shareholders or creditors generally, nor was the June 15, 2001 Form 8-K ever amended.

59.     On or about October 15, 2001, Duane K. Boyd caused to be incorporated in the

State of Texas "Interline Travel & Tour, Inc.", hereinafter referred to as "Interline."  The initial

stockholders of Interline were Duane K. Boyd and Lawrence K. Fleischman.

60.    Shortly after the incorporation of Interline, Duane K. Boyd and Lawrence K. Fleischman transferred to Interline their rights and security interests arising from the May 24, 2001 and July 18, 2001 loan documents in exchange for a note due from Interline. Interline also retained the same attorney which had represented Boyd and Fleischman individually, i.e., Timothy Taylor of Jackson & Walker, L.L.P.

61.    On or about October 19, 2001, Interline through its above stated attorney sent by certified mail to GATT, attention to Joseph S. Juba, the then President of GATT, a "Notice of Acceleration and Demand for Payment, Notice of Foreclosure."

62.    The above October 19, 2001 Notice stated that Interline, now as the new owner of the May 24, 2001 and July 18, 2001 notes and Security Agreement, was thereby accelerating the maturing of the notes, demanded payment in full by 5:00 pm October 29, 2001, and stated that if such payment were not made Interline intended on foreclosing the collateral by public sale.

63.    The above October 19, 2001 Notice of Intent to Accelerate and Demand for Payment Notice of Foreclosure was never disclosed by GATT, Joseph S. Juba, Duane K. Boyd, or Lawrence K. Fleishman to the S.E.C., nor was the June 15, 2001 Form 8-K ever amended.

64.    Neither Joseph S. Juba as President, Director, and Chief Operating Officer of GATT, nor Matthew O'Hayer as Chairman of the Board of Directors of GATT, retained any attorney to respond to either of the aforesaid October 9, 2001 or the October 19, 2001 notices, nor gave any responses to such notices, nor attempted to negotiate any terms on behalf of GATT.

65.    Interline scheduled a foreclosure auction against GATT's assets to take place on October 30, 2001 at 11:00 am, at the steps of the Travis Texas County Courthouse.

66.     In order to advertise the foreclosure auction, Interline posted a notice on the Travis Texas County Courthouse door on October 22, 2001, less than 10 days from the date of the sale, and ran a small classified legal advertisement for a few days in a local Austin, Texas newspaper. Interline also notified by certified mail certain secured creditors which held liens against GATT's assets. The most significant such creditor was Wells Fargo, which held a lien in the amount of approximately $166,000.00 (one hundred sixty-six thousand dollars).

67.     Neither Interline, Boyd, nor Fleischman took any other steps to advertise or promote the foreclosure sale, nor sought to hire a professional auctioneer to promote and conduct an auction, nor sought to locate a potential buyer of GATT's assets within the travel industry such as one of GATT's competitors. Neither Interline, Boyd, nor Fleischman attempted to realize the greatest amount possible from the "sale" of GATT's assets at the foreclosure, nor any amount greater than the recently transferred, alleged indebtedness of GATT.

68.     Interline, Boyd, and Fleischman gave the foreclosure sale the least amount of publicity possible, and only what they believed was absolutely necessary to create the appearance of a bona-fide arms length transaction, in order that the sale might survive judicial scrutiny.

69.     On October 30, 2001, Interline's attorney himself, i.e., Timothy Taylor of Jackson & Walker, L.L.P., allegedly conducted the foreclosure auction of GATT's assets at the front steps of the Travis Texas County Courthouse. No third-party auctioneer was present, nor was the "auction" recorded in any manner other than by Interline's attorney.

70.     The only individuals to attend the alleged foreclosure auction were Interline's attorney who conducted the "auction," and Duane K. Boyd. Boyd allegedly bid the amount of $340,000.00 (three hundred forty thousand dollars), as credit against GATT's alleged indebtedness to Interline.

14

71.    Also on October 30, 2001, Duane K. Boyd and Lawrence Fleischman reached an agreement with Wells Fargo to acquire Wells Fargo's $166,000 (one hundred sixty-six thousand dollars) security interest in GATT"s assets for the discounted sum of $105,000.00 (one hundred and five thousand dollars).  Boyd & Fleischman then transferred such security interest to Interline. The remainder of GATT"s secured creditors were minor, and were advised by Interline to take possession of their secured property.  As a result of the foreclosure auction and the Wells Fargo agreements, Interline now purported to control and have a first priority on all of the GATT assets.

72.    Also on October 30, 2001, following the foreclosure "auction," Boyd returned to GATT's offices at 211 East 7th Street, Southwest Tower, 11th Floor, Austin, Texas 78701. Joseph S. Juba, then the President, Chief Operating Officer, and a director of GATT, was working in GATT's offices as usual that day.

73.    After a meeting with Boyd and being informed that nobody else had attended the foreclosure auction, Juba immediately became an employee of Interline.  At some point thereafter, Juba resigned as an officer and director of GATT, leaving only Matthew O'Hayer as a director of GATT.  Within 60 (sixty) days of the foreclosure auction, Juba became a stockholder of Interline, and shortly thereafter an officer of Interline, a position which he presently maintains.

74.    Shortly following the foreclosure auction, Matthew O'Hayer signed a consulting agreement with Interline, and as a part thereof received stock options with Interline, and became a shareholder in Interline.  He was retained to act as a consultant to Interline from November 1, 2001 (two days after the foreclosure sale), until December 2003.  He presently continues to be a shareholder in Interline.  His name also appears on the ADP Payroll report of Interline for the 4th Quarter of 2001, i.e., the same quarter as the foreclosure auction.

75.    Matthew O'Hayer held the largest share of GATT stock. He currently lives on a yacht in the British Virgin Islands, remains on good terms with Juba and Boyd, and maintains contact with them by email.

76.    The law firm of Akin, Gump, Strauss, Hauer & Feld, L.L.P., ("Akin Gump") had acted as counsel to GATT and prepared the May 24, 2001 and July 18, 2001 loan documents, including the July 18, 2001 Security Agreement. Notwithstanding that Interline and GATT were adversaries due to the October 30, 2001 foreclosure auction, less than two months later, on December 27, 2001, Akin Gump became counsel for Interline Travel & Tour, Inc.

### Commonality of Interline & GATT
### Management, Employees, Officers, Directors, Shareholders, and Control Persons

77.    Interline and GATT shared a commonality of key personnel and individuals with ability to control their affairs. Of the eight individuals identified as control persons in GATT's April 17, 2000 Form 10-K, five such individuals became, and presently remain, employees, officers, directors and/or shareholders in Interline, namely (a) Matthew O'Hayer, (b) Joseph S. Juba, (c) Fernando Cruz Silva, (d) Patti Macchi, and (e) Duane K. Boyd. Additionally, Lawrence K. Fleischman, presently Chairman of Interline, although never formally becoming a director of GATT, was a shareholder of GATT, had often attended GATT board meetings, entered into a consulting agreement with GATT, and provided services to GATT. Other than Matthew O'Hayer, who's consultant agreement with Interline terminated in December 2003, all such persons are presently key individuals in the present management of Interline.

16

78.     On the day of the foreclosure sale, and immediately thereafter, the initial staff and management of Interline, its officers and directors, consisted entirely of the above individuals, and former GATT employees which had been employed by GATT on the date of the foreclosure.

79.     Interline's initial staff and management, officers and directors, consisted entirely of Lawrence K. Fleischman, Duane K. Boyd, and former employees, officers, or directors of GATT.

80.     Subsequently, Interline hired additional individuals which were not GATT employees on of the date of the foreclosure, but which had previously been GATT employees.

81.     At present, the majority of Interline's employees are former employees of GATT.

<u>Interline Continued Operations of GATT</u>
<u>after the Forecloure "Auction"</u>

82.     The day of the foreclosure auction, Interline proceeded to assume the operations of GATT.  Virtually all of GATT"s employees immediately began working for Interline.  The only new employees of Interline which were not previously employed earlier that day by GATT, were Boyd and Fleischman.  'Interline' continued to answer GATT's "1-800" telephone calls and to conduct business which earlier that day was being conducted by GATT.  The telephones were answered with the name "Interline" or "Interline Vacations," whereas earlier that day they had been answered with the name "Interline" or "Interline Travel Reps."  Interline utilized, at the same location formerly utilized by GATT, the same office furniture, office machines, computers, software, customer lists, telephone system, telephone lines, telephone numbers, web site

17

addresses, email addresses, and mail boxes which had been formerly utilized by GATT earlier that same day.

83.     As a result of Interline's continuation of GATT's operations immediately following the foreclosure sale, there was no cessation of operations at the offices of GATT, which had then become the offices of Interline.

84.     Shortly after the foreclosure auction, Interline executed a short-term seven (7) month lease to remain in a portion of the premises formerly leased to GATT located at 211 East 7th Street, 11th Floor, Austin Texas, in order to continue, as 'Interline' and without interruption, former operations of GATT.

85.     In order that its telephone sales would continue uninterrupted,  Interline also re-negotiated a lease for the telephone system which GATT was using on the date of the foreclosure sale.  Interline also re-negotiated agreements for telephone services which were required to maintain the uninterrupted operation of GATT's, now Interline's, telephone call center.

86.     Most of GATT's sales took place over the telephone, and most of Interline's sales take place over the telephone.  Interline continued and continues to use the good will and intangibles of GATT which it acquired from the "foreclosure auction," including GATT's various toll-free telephone numbers, and in particular 1-800-PERX-NOW, a telephone number which was widely promoted by GATT.

87.     Among the other intangible property of GATT which Interline continues to use, is GATT's web site address of Perx.COM, which was widely promoted by GATT in its various publications and solicitations.

88.     Defendant GATT published, among other things, a publication referred to as the

18

"Interline brochure." Defendant Interline continues to publish the "Interline brochure" with the same content, created by the same creative director, with the same software, and the same computers, as had been by GATT.

89.    Interline also utilized and continues to utilize valuable customer lists it acquired from GATT. After the foreclosure, Interline immediately used the same customer lists to conduct business rather than build up a new client base. Interline uses such lists to solicit customers and to distribute the Interline brochure.

90.    GATT had aggressively sought to acquire customer lists and other intangible assets of competing "interline" travel related service companies. In one such acquisition, on November 8, 1999, GATT acquired the interline related assets of Weissman Sales & Marketing, Inc., a privately held travel company offering cruises and tours to the retail and interline markets. The most significant assets identified by GATT acquired were certain trade names and a client list with over 20,000 airline employee names. The purchase consideration was paid in cash and accounted for using the purchase method of accounting. GATT expected this acquisition to generate in excess of $2 million (two million dollars) in annual revenues with no material increase in related operating expenses. GATT had also acquired other interline travel related companys' intangible property prior to the foreclosure auction.

91.    As of GATT's November 21, 2000 form 10-QSB filed with the S.E.C., GATT's balance sheet identified $1,105,369 (one million, one-hundred five thousand, three-hundred sixty-nine dollars) specifically as intangible assets, net of accumulated amortization. Interline's bid of only $340,000 (three hundred forty thousand dollars) made one year later at the foreclosure sale, for 100% of GATT's assets, fell far short of this amount, even if only GATT's intangible assets had been included in the foreclosure sale.

19

### Interline's Assumption of GATT Liabilities
### Necessary For the Continued Operation of GATT's Business

92.     Interline paid the selective liabilities of GATT which it deemed essential to continuing the desired operations of GATT, including but not limited to the outstanding "1-800" telephone usage of GATT, as well as bills owed by GATT to its writers and photographers, and certain payroll taxes.

93.     Similarly, Interline recognized certain pre-paid expenses and unearned income of GATT. Interline honored and/or recognized certain accumulated vacation time of GATT employees ($15, 292.07), accrued payroll taxes ($1,169.84), deferred cruise revenue ($83,675.68), and deferred hotel revenue ($108,358.30). Interline also honored pre-paid travel of GATT's customers who had not yet traveled as of the date of the foreclosure auction by giving equivalent discounts against future purchases or equivalent value as free giveaways.

### The Purpose Of Conducting The Foreclosure Sale
### Was To Escape Liability

94.     There were two primary reasons for the formation of Interline by Boyd. First, Boyd wished to have a corporate vehicle wherein the intangible and intellectual property of GATT could realize its value through an ongoing business concern. Boyd considered that the major assets of GATT which Interline would receive through a foreclosure sale were the intangible and intellectual property of GATT, such as its web-sites, customer lists, the employee

20

knowledge of GATT's employees, and the "1-800" telephone numbers which GATT's customers were accustomed to calling. Acquiring such intangibles and intellectual property was the major reason for Boyd causing Interline to conduct the foreclosure sale. Second, Boyd wished to have a new, clean corporate entity established free from liabilities which would be attractive to investors.

95.    The formation of Interline by Boyd & Fleischman was intended to facilitate, in a re-organized fashion, the continued operation of the most valuable and viable components of GATT's business through a clean, new corporate form. Shortly after its formation, Interline became 20% owned by Synergy Brands, Inc., another publically traded company associated with Lawrence K. Fleischman. It was not Boyd's, Fleischman's, nor Interline's intention nor desire to realize the maximum possible revenue through the sale of GATT's assets by a properly conducted foreclosure auction. Rather, Interline, Boyd & Fleischman sought to acquire the valuable assets of GATT at a windfall through a quietly and inconspicuously conducted foreclosure sale.

96.    Boyd believed that conducting the foreclosure through a legal procedure would protect Interline from any claims of GATT's creditors and clothe the sale with the apparent bona-fides of an arms-length transaction. Interline would not have conducted the foreclosure sale if Boyd believed that it would not insulate Interline from claims of GATT's creditors.

97.    Creditors of GATT which contacted Interline demanding payment and for which Interline found no future business needs, were mailed a package of documents by Interline reflecting the foreclosure auction. This was, in the words of Joseph S. Juba, the former President of GATT now employed by Interline, to say to such creditors: "Here's what happened. Here's the deal. Go away."

21

## IV.  First Count
(Breach of Contract)

98.    Paragraphs 1 - 97 are hereby incorporated by reference, repeated and and realleged as if fully set forth herein.

99.    By its failure to remit payment pursuant to the terms of ¶ 5 of the Agreement, GATT has breached the Agreement and has thereby caused Plaintiff to incur damages, including but not limited to the unpaid principal amount of the purchase price of the Aspect Call Center, finance charges called for under the Agreement, as well as costs and attorneys fees.

## V.  Second Count
(Successor Liability)

100.    Paragraphs 1-99 are hereby incorporated by reference, repeated and realleged as if fully set forth herein.

101.    The giving of the security interest in 100% of GATT's assets to Boyd and Fleischman in the July 18, 2001 Security Agreement, without the same being disclosed to the S.E.C., nor otherwise to the public, GATT's shareholders or creditors generally, was improper and fraudulent, and lacked the bona-fides of an arms length transaction.

102.    Further, the value of GATT's assets at the time was disproportionately greater than the financing allegedly provided by Boyd & Fleischman, therefore the giving of the security interest to Boyd & Fleischman under the Security Agreement was not for a fair consideration.

103.    This combined with Juba's failure, acting as President and a director of GATT, to take any steps to determine the value of GATT's assets being pledged to Boyd & Fleischman, or to itemize the assets being pledged to Boyd & Fleischman, further taints the Security Agreement and the giving of the security interest to Boyd & Fleischman with self-dealing, fraud, and lacks the bona-fides of an arms length transaction.

104.    Interline was formed by Boyd for the express purpose of acquiring GATT's assets in order to take over, re-organize, and continue the business of GATT while escaping liability from GATT's creditors.

105.    Interline, Boyd & Fleischman conducted a sham foreclosure sale with the blessing of Juba and O'Hayer, the remaining directors of GATT who immediately thereafter became either employees or consultants for Interline.  None of these individuals advertised or offered GATT's assets, including its valuable customer lists, to other similar companies in the same industry, indicating that it was never the intention by any such individuals to act with the best interests of either GATT's creditors or stockholders, but rather to escape GATT"s liabilities while retaining GATT's value for their own personal benefit.

106.    GATT's management had on numerous occasions acquired other "interline" related company's assets and was therefore aware of the means and the market to offer GATT's assets for sale in a competitive and commercially reasonable manner.  Instead, the above individuals conducted or allowed to be conducted a commercially unreasonable "foreclosure auction" on the front steps of the local courthouse, which virtually nobody knew about other than themselves, conducted by Interline's own attorney, and where nobody else attended other than Interline's own representative Duane K. Boyd.

23

107.    The manner by which the auction was advertised and conducted renders it tainted with self-dealing, fraud, and lacks the bona-fides of an arms length transaction.

106.    The "foreclosure auction" yielded far less than the $12 million dollars worth of assets which GATT indicated on its most recent financial statements filed with the S.E.C. Duane K. Boyd is and has been a Certified Public Accountant for 30 (thirty) years, and knew or should have known that both the granting of the security interest and the amount "credited" at the foreclosure sale were not a fair consideration for GATT's assets.

107.    Because the "foreclosure auction" was intended to bring about, and did bring about, a windfall acquisition to Interline, it was not conducted in a commercially reasonable manner, is tainted with self-dealing, fraud, and lacks the bona-fides of an arms-length transaction.

108.    There is a sufficient commonality among the former officers, directors, and shareholders of GATT which had the ability to control the affairs of GATT, and those of Interline, to find that Interline is the mere continuation of GATT, merely wearing a new hat.

109.    GATT never filed a bankruptcy petition, nor sought any formal winding-up of its affairs. It's last public filing made with the S.E.C. was the June 15 Form 8-K, wherein it stated only that a 65% interest in its U.K. Subsidiary, GATT U.K., was being used to collateralize the May 24, 2001 notes to Boyd & Fleischman. By the conducting of the "foreclosure auction," unbeknownst to virtually all of GATT"s creditors, shareholders, and the S.E.C., all parties who were involved in the series of transactions ending up with GATT becoming Interline, avoided any judicial scrutiny of their activities.

24

**WHEREFORE**, the Plaintiff Call Center Technologies, Inc. respectfully prays for judgment in its favor and against the Defendants GATT and Interline as follows:

(a)   As to Defendant GATT:  Awarding money damages for breach of the Agreement, finance charges as called for under the Agreement, costs and attorneys fees and any other relief which the Court deems just, equitable and proper;

(b)   As to Defendant Interline: A judgment finding that Interline is liable to Plaintiff as the successor of Defendant GATT under the equitable doctrine of successor liability for the amount of damages awarded by this Court against Defendant GATT and in favor of Plaintiff.

Respectfully submitted,

PLAINTIFF,
CALL CENTER TECHNOLOGIES, INC.

By      _____
Kevin P. Chamberlin
100 Mill Plain Road, 4th Floor
Danbury, CT 06810
203-792-0011
203-792-3370 (fax)
Federal Bar CT26843

Dated: February 15, 2005

25

## <u>CERTIFICATION</u>

I hereby certify that a copy of the above objection was mailed and faxed on February 15, 2006 to:

Law Offices of Laura Baldini
2 Batterson Park Road, 2nd Floor
Farmington, CT  06032

BY: _____
Kevin P. Chamberlin