UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-------------------------------------------------------------- X
Call Center Technologies, Inc.,

                                          Plaintiff,         **MEMORANDUM RULING**

          -against-                          Case No. 03-1036 (TLM)

Grand Adventures Tour & Travel Publishing Corp.
et al.,

                                        Defendants
----------------------------------------------------------X

### Prologue

As a result of the rather unusual procedural history and posture of this ancient case as trial commenced on October 28, 2013, the undersigned felt that a short section, a prologue if you would, in advance of the Court's ruling might be of assistance to the casual reader and would be of assistance to the lawyers for the parties and, more importantly, to the Circuit Court in understanding this Court's ruling and its rational and reasons therefore. This missive is not intended to repeat what is contained in the body of the ruling that follows, but rather is intended to set the stage for the ruling.

**I.      United States Court of Appeals for the Second Circuit**

It is axiomatic that when a higher court "decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983) (citing *Southern Ry. Co. v. Clift*, 260 U.S. 316, 319 (1922); *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)). The parameters for, and the universe of, this case were established by the United States Court of Appeals for the Second Circuit in its March 11, 2011 decision. *Call Ctr. Techs., Inc. v. Grand Adventures Tour and Travel Publ'g Corp.*, 635 F.3d 48

(2d Cir. 2011). The trial court endeavored to follow the Circuit Court's mandate in its rulings, evidentiary or otherwise, both prior to and during the trial.

## II.    United States District Court for the District of Connecticut

Courts have a "general practice of refusing to reopen what has been decided." *Slotkin v. Citizens Cas. Co. of New York*, 614 F.2d 301, 312 (2d Cir. 1979). Even though "rulings made pre-trial by a district judge are subject to modification . . . at any time prior to final judgment," this practice is discouraged in order to give the parties "'reliable guidance . . . to conduct their affairs.'" *In re Agent Orange Product Liability Litigation*, 733 F.2d 10, 13 (2d Cir. 1984) (citing *Dictograph Prods. Co. v. Sonotone Corp.*, 230 F.2d 131, 135 (2d Cir. 1956)). Thus, while the referring judge's September 30, 2013 Ruling on Plaintiff's Motion in Limine [Rec. Doc. 304] could have been revisited and set aside, given the history and the totality of the circumstances of the case, the undersigned found no reason to revisit that ruling.

## III.    Superior Court, Judicial District of Danbury, Connecticut

There is a related case pending in the Superior Court, Judicial District of Danbury, Connecticut, Civil Action No. DBD-CV02-0346965-S, between plaintiff Call Center Technologies, Inc. and former defendant in this proceeding Grand Adventure Tour & Travel Publishing Corp. on the underlying contract dispute at issue in plaintiff's successor liability claim against defendant, Interline Travel & Tour, Inc. in this proceeding, in which defendant has intervened. [Rec. Doc. 310]. Based on the Court's September 12, 2013 telephone conference with the attorneys for the parties, as memorialized by a Minute Entry of the same date [Rec. Doc. 299], the Court will issue the memorandum ruling that follows, but will not enter judgment on the ruling pending further rulings in the Superior Court.[1]

---

[1] Pending the outcome of a motion to stay that was before the state court, the Court instructed the attorneys that it would proceed in one of three ways at trial:

## Memorandum Ruling

### I.    History of the Proceeding from the Date Trial Commenced

This matter was tried before the Court as a bench trial on October 28-31 and November 1 and 14, 2013. At the close of the trial, the Court advised the attorneys for the parties that it would issue a ruling as soon as practicably possible after receipt of the attorneys' post-trial filings, which the attorneys were ordered to make. [Rec. Doc. 339; Trial Tr. 1195:2-8, Nov. 14, 2013, Rec. Doc. 356].

### II.    Rulings on Issues Raised in Pre-trial Briefs

#### a.    Choice of law

In its pre-trial brief, defendant Interline Travel & Tour, Inc. (referred to hereinafter as "Interline") made a belated argument that the Court should apply Texas, rather than Connecticut, law in deciding the issue of successor liability. [Rec. Doc. 308, at 24-29]. The Court announced prior to the commencement of trial, based on the history and record of the case, that it would apply Connecticut, not Texas, law. "In a diversity action such as this one, a federal court must apply the choice of law rules of the forum state. In Connecticut, the Court must select the local

---

1. If the state court grants the requested stay, the Court will conduct the trial on October 28-October 31, 2013 as scheduled and it will issue its ruling in the normal course. If after trial this Court finds that Interline has no successor liability, it will enter a judgment of dismissal in favor of Interline. If the Court finds in favor of Plaintiff and that there is successor liability, the Court will issue a memorandum ruling setting forth the reasons for the finding of liability, but will not enter judgment on that ruling pending the outcome of the state court proceeding. If the state court thereafter finds that Grand Adventure is not liable for breach of contract, the Court will vacate its memorandum ruling and enter a judgment dismissing all claims against Interline. If the state court finds that Grand Adventure is liable for breach of contract, the Court will enter judgment in favor of Plaintiff pursuant to its memorandum ruling.

2. If the state court denies the requested stay but does not issue a judgment on September 23, 2013, the Court will proceed to trial as scheduled and follow the same procedure as outlined in section 1 above.

3. If the state court denies the requested stay and issues a judgment on September 23, 2013, the Court will proceed as follows: (a) if the state court issues a judgment in favor of Plaintiff, through default judgment or otherwise, the Court will conduct the trial as scheduled and issue judgment in the normal course, or (b) if the state court issues judgment in favor of Grand Adventure, the Court will upset the scheduled trial and enter judgment dismissing all claims against Interline.

[Rec. Doc. 299 at 1-2]. The state court granted Interline's motion to intervene in the state court action and stayed the state court action pending the outcome of this case [Rec. Doc. 310].

law of the state having the 'most significant relationship' to the occurrence and the parties to the dispute." *Greystone Cmty. Reinvestment Ass'n, Inc. v. Berean Capital, Inc.*, 638 F. Supp. 2d 278, 286 (D. Conn. 2009) (citations omitted); *see also Reichhold Chems., Inc. v. Hartford Accident and Indem. Co.*, 252 Conn. 774, 778 (2000). However, even when a valid choice of law argument exists, a party may relinquish its right to have the laws of a particular state applied if it fails to raise the choice of law issue in a timely manner. Relying on the waiver doctrine and judicial estoppel, the Court held that Interline could not raise the choice of law issue on the eve of trial. [Trial. Tr. 14:6-18:19, Oct. 28, 2013, Rec. Doc. 323].

A party that argues the applicability of one state's laws throughout a proceeding, even if the choice of law issue is never squarely addressed, may be prevented by the waiver doctrine from later arguing the applicability of a different state's laws. *See Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 891 (7th Cir. 2013); *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002); *Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991). The Court found that Interline consented to the application of Connecticut law by relying solely on Connecticut law throughout the ten year history of this lawsuit, including in its motion for summary judgment, in which it was partially successful. *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000); *Tehran-Berkeley Civil and Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) (parties' briefs that discussed only one state's laws gave implied consent to use those laws and were sufficient to establish choice of law).

Judicial estoppel applies when a party's position is: 1) clearly inconsistent with an earlier position; 2) "the party's former position has been adopted in some way by the court in the earlier proceedings;" and 3) the party would unfairly benefit from being able to change positions.

*Adelphia Recovery Trust v. HSBC Bank USA*, 634 F.3d 678, 695-96 (2d Cir. 2011); *see also*

*Zedner v. United States*, 547 U.S. 489, 504 (2006). Applying the *Adelphia* principles, the Court

found, first, that Interline's argument to apply Texas law was clearly inconsistent with its earlier

position that argued Connecticut law, especially in light of Interline's assertion that Connecticut

and Texas law governing successor liability are substantially different. [Rec. Doc. 319, at 1].

Second, the Court found that Interline's previous position was adopted by the Court in earlier

proceedings when the District Court granted, and the United States Court of Appeals for the

Second Circuit affirmed, summary judgment in favor of Interline on Call Center Technologies,

Inc.'s (referred to hereinafter as "Call Center") fraud theory of successor liability, which

Interline argued entirely under Connecticut law. *Call Ctr. Techs., Inc. v. Grand Adventures Tour*

*and Travel Publ'g Corp.*, 635 F.3d 48, 52 (2d Cir. 2011). Finally, the Court found that Interline

would unfairly benefit from being able to change its position on the eve of trial, as it had

previously defeated Call Center's fraud theory of successor liability under Connecticut law and

was now seeking to defeat the continuity of enterprise theory[2] of successor liability under Texas

law, from which it may or may not have benefited with respect to the fraud theory on which it

had previously prevailed.

     **b.**    **Defenses**

     In its pre-trial brief, Interline also argued that it should be allowed to present evidence in

support of the equitable defenses of unclean hands, laches, and what it described as "Call

Center's exorbitant interest claim." [Rec. Doc. 308, at 45-50]. Interline argued that Call Center's

alleged wrongdoing associated with the underlying breach of contract action pending in state

---

[2] The "continuity of enterprise" theory is Connecticut's favored approach to the "common law mere continuation" theory of successor liability. *Call Ctr.*, 635 F.3d at 53 (quoting *Kendall v. Amster*, 948 A.2d 1041, 1051 (Conn. App. Ct. 2008)).

court should be introduced in support of Interline's unclean hands defense against successor liability. [Rec. Doc. 308, at 47-49]. The Court concluded that such evidence was precluded by the Ruling on Plaintiff's Motion in Limine issued by the referring judge, the Honorable Dominic J. Squatrito [Rec. Doc. 304], which prevented introduction of evidence that related to plaintiff's underlying breach of contract claim against Grand Adventures Tour & Travel Publishing Corp. (referred to hereinafter as "GATT") pending in state court but did not relate to its successor liability claim against Interline, pending before this Court. [Trial Tr. 20:13-22:2, Oct. 28, 2013, Rec. Doc. 323].

The record will reflect that prior to the case being reassigned to the trial judge, Judge Squatrito granted Interline's Motion to Reconsider its Motion Sever [Rec. Doc. 223],[3] severed the case, and remanded the underlying breach of contract claim to state court. [Rec. Doc. 230]. In support of its Motion to Sever, Interline stated: "[t]he plaintiff also argues that this matter is 'not severable' because it 'has no claim against Interline which is not dependent upon Plaintiff's principal claim against GATT,' but this only highlights the potential prejudice to Interline, not the plaintiff. . . . [W]hatever prejudice to Interline might exist from the severance and dismissal of GATT is prejudice Interline is willing to bear." [Rec. Doc. 218, at 7]. As Judge Squatrito's Ruling on Plaintiff's Motion in Limine notes, Interline's inability to present evidence as to the underlying contract claim is precisely the type of prejudice Interline accepted when it moved to sever claims. [Rec. Doc. 304]. Furthermore, determination of what equity requires is a matter of judicial discretion. *TD Bank, N.A. v. M.J. Holdings, LLC*, 143 Conn. App. 322, 326-27 (2013). The Court therefore found that it need not consider plaintiff's actions in the underlying breach of

---

[3] Interline's Motion to Sever [Rec. Doc. 215] was initially denied by the Second Circuit motions panel on May 8, 2009 [Rec. Doc. 220], and was then denied as moot by Judge Squatrito on June 5, 2009 [Rec. Doc. 221]. Judge Squatrito, in his November 19, 2009 Order, granted Interline's Motion for Reconsideration of the Motion to Sever [Rec. Doc. 223], after finding that the Second Circuit panel's decision "was only provisional and interlocutory." [Rec. Doc. 230, at 3].

contract claim or any arguments relating to the ultimate amount of damages that may be awarded in order to successfully balance the equitable interests at stake. [Trial Tr. 20:19-21:2, Oct. 28, 2013, Rec. Doc. 323; Trial Tr. 1130:10-13, Nov. 14, 2013, Rec. Doc. 356].

The Court did allow Interline to present a defense of laches as it related to the issue of successor liability, but not as to the underlying contract dispute. [Trial Tr. 1164:4-18, Nov. 14, 2013, Rec. Doc. 356]. The sole issue before the Court was successor liability, the underlying contract dispute against former defendant GATT having been severed and remanded to state court. Interline has successfully intervened in the state court action and obtained a stay of the state court case pending the outcome of this case. [Rec. Docs. 302 and 310]. Interline will have the opportunity to be heard regarding the underlying contract claim in state court. Contrary to the defendant's contention that "[t]he Court precluded Interline from pursuing its laches theory," [Rec. Doc. 345, at 29], the Court reiterated during trial that it was "not precluding [the defendant] from doing anything as it relates to laches, as to the successor liability," [Trial Tr. 1164:16-18, Nov. 14, 2013, Rec. Doc. 356].[4] Within the scope of admissible evidence pursuant

---

[4] After discussing laches and what evidence the defendant could introduce in support of such defense, the following exchange occurred between the Court and defendant's attorney Farley.

THE COURT: Okay. You understand my view is that the issue of laches relates to successor liability, not the underlying contract in this proceeding. You understand that's my view?

MR. FARLEY: Yes. I have a different view.

THE COURT: All right. And that is not to say, make sure we're on the same page, and you're a good lawyer and I'm not going to tell you what questions to ask, if there are not some questions for a limited time period that might be asked of the witness.

MR. FARLEY: Yes.

THE COURT: But all this stuff that you got to lay a foundation and all of that, the ruling is the ruling. But I'm not precluding you from doing anything as it relates to the laches, as to the successor liability.

MR. FARLEY: Right. We just have a different opinion over what laches theories relates to the successor liability claim. . . .

to Judge Squatrito's Ruling on Plaintiff's Motion in Limine [Rec. Doc. 304], the Court has considered Interline's laches argument.

### III.    Duty of the Trial Judge in a Proceeding Tried to the Court

In any bench trial, the trial judge has to evaluate the credibility of the testifying witnesses, the witnesses' demeanor, any previous inconsistent statements by a witness, as well as the explanation for any such inconsistent statements. The United States Supreme Court has stated that "[t]rial judges have the unique opportunity to consider the evidence in the living courtroom context, while appellate judges see only the cold paper record." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 438 (1996) (citations and internal quotation marks omitted). The United States Court of Appeals for the Second Circuit has stated that "the full flavor of a hearing cannot be sensed from the sterile sheets of a transcript." *ABC, Inc. v. Stewart*, 360 F.3d 90, 100 (2d Cir. 2004) (citations and internal quotation marks omitted). The record will reflect that the Court questioned each witness that testified extensively, and that all non-party witnesses were sequestered during the course of trial. The Court's findings of fact that follow are in no small part based on the trial judge's view of the credibility of the witnesses, based on their trial testimony and demeanor at trial, as well as the documentary evidence and the explanation of, or reconciliation of, any inconsistent statements made by a witness during his or her trial testimony or previous inconsistent statements, written or oral, made by a witness.

The Court also notes that due to the layout of the courtroom in which the trial was conducted, the trial judge was seated between eight and ten feet from each witness as the witness testified.

---

THE COURT: I just want to make sure the record's clear . . . at some point thereafter you say, 'Judge, your ruling here precludes me from ever raising that,' and again, to the contract, that's not before me anyhow. If you can't raise it separate and apart from this proceeding, you can't raise it. You can raise it as to successor liability, different animal.

[Trial Tr. 1164:4-1165:6, Nov. 14, 2013, Rec. Doc. 356].

**IV.     Order of Witnesses' Testimony and the Court's View of Witnesses' Credibility**

The first witness to testify was Duane K. Boyd (referred to hereinafter as "Boyd"),

defendant Interline's President and one of its founders as well as a former director and consultant

for GATT. The Court found Boyd to be extremely intelligent and articulate and found his

testimony to be generally consistent, forthright, and credible. The second witness to testify was

Lawrence P. Fleischman (referred to hereinafter as "Fleischman"), Interline's co-founder,

Chairman, and Chief Executive Officer as well as a former consultant for GATT. The Court

found Fleischman to also be extremely intelligent and articulate and his testimony to be generally

consistent, forthright, and credible. The third witness to testify was Joseph Juba (referred to

hereinafter as "Juba"), Executive Vice President of Interline and former President and Chief

Operating Officer of GATT. The Court found his testimony to be generally consistent, forthright,

and credible. The fourth witness to testify was Fernando Cruz-Silva (referred to hereinafter as

"Cruz-Silva"), Senior Vice President of Interline and a former Senior Vice President of GATT.

The Court found his testimony to be generally consistent and credible, although his memory was

somewhat more clouded from the passage of time than other witnesses, possibly because of the

less prominent role he played at GATT and Interline, his domestic situation at the time of the

events in question, or both. The fifth witness to testify was Patricia Macchi (referred to

hereinafter as "Macchi"), Vice President of Interline and former Vice President of GATT. The

Court found her testimony to be consistent, forthright, and credible. The sixth and final witness

to testify was Dean Vlahos (referred to hereinafter as "Vlahos"), President of plaintiff Call

Center. The Court found his testimony to be generally consistent, forthright, and credible. In

Churl Yo (referred to hereinafter as "Churl Yo"), a former employee of GATT who was later

employed by Interline, testified by deposition in lieu of live testimony. Thus, all the Court had before it was the deposition transcript and was in effect, as it relates to Churl Yo's testimony, in the same position as an appellate court reviewing a transcript. Churl Yo's testimony was generally consistent with that of the other witnesses as to the events surrounding GATT and Interline before and after the October 30, 2001 foreclosure sale.

## V.    Findings of Fact

In any trial, civil or criminal, there are two types of evidence the trier of fact may consider: direct evidence, such as testimony of an eye witness, and indirect or circumstantial evidence, the proof of circumstances that tends to prove or disprove the existence or nonexistence of certain other facts. The law makes no distinction between direct and circumstantial evidence. In a civil case such as this one, the law simply requires that the trier of fact find the facts from a preponderance of all the evidence.

The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). In some instances, a finding of fact may also be a mixed conclusion of law and in other instances a conclusion of law may include findings of fact.

### a.    History of the Proceedings

1.    Plaintiff Call Center filed a breach of contract action against former defendant GATT in the Superior Court, Judicial District of Danbury, Connecticut in August 2002. *Call Ctr. Techs., Inc. v. Grand Adventures Tour and Travel Publ'g Corp.*, 635 F.3d 48, 50 (2d Cir. 2011); [Vlahos, Trial Tr. 1179:6-7, Nov. 14, 2013, Rec. Doc. 356]. Plaintiff thereafter, in the spring of 2003, amended its complaint in the state court proceeding to add Interline as a party defendant. *Call Ctr.*, 635 F.3d at 50.

2.      On June 10, 2003, plaintiff's complaint was removed from the Superior Court, Judicial

District of Danbury, Connecticut to the United States District Court for the District of

Connecticut. [Rec. Doc. 1].

3.      The case was originally assigned to United States District Judge Stefan R. Underhill and

was reassigned to United States District Judge Dominic J. Squatrito on December 8,

2004. [Rec. Doc. 55].

4.      On February 19, 2009, Judge Squatrito granted Interline's motion for summary judgment

on all of Call Center's claims against it, those claims being breach of contract and

successor liability premised on the "mere continuation" or "fraudulent transaction"

theories, and granted Call Center's motion for default judgment against GATT. [Rec.

Docs. 207 and 208].

5.      On November 19, 2009, Judge Squatrito vacated his default judgment against GATT,

dismissed GATT from this proceeding, and remanded plaintiff's breach of contract claim

against GATT to Connecticut Superior Court. [Rec. Doc. 230]. The Connecticut Superior

Court has since entered a default against GATT and Interline has successfully intervened

in and obtained a stay of the state court proceeding. [Rec. Doc. 310].

6.      On March 11, 2011, the United States Court of Appeals for the Second Circuit reversed

and remanded the portion of Judge Squatrito's February 2009 ruling that granted

summary judgment in favor of Interline on the "mere continuation," [5] theory of successor

liability and affirmed his grant of summary judgment on Call Center's fraud theory of

successor liability. *Call Ctr.,* 635 F.3d at 55.

---

[5] Judge Squatrito's Order refers to the "mere continuation" theory of successor liability, while the Second Circuit analyzed the issues using the "continuity of enterprise" theory, which is Connecticut's preferred approach to the "mere continuation" theory discussed in Judge Squatrito's Order. *Call Ctr.*, 635 F. 3d at 53.

7.    On December 17, 2012, Judge Squatrito vacated the Judgment in Interline's favor [Rec.

      Doc. 208] and that portion of his prior Order [Rec. Doc. 207] granting summary

      judgment in favor of Interline based on the "mere continuation" theory of successor

      liability. [Rec. Doc. 252].

8.    The case was reassigned to the undersigned on May 22, 2013. [Rec. Doc. 273].

9.    Plaintiff Call Center was and is a Delaware corporation with a principal place of business

      in Brookfield, Connecticut. [Vlahos, Trial Tr. 1119:12-20, 1123:21-22, Nov. 14, 2013,

      Rec. Doc. 356].

10.   Defendant Interline was and is a Texas corporation with a principal place of business in

      Austin, Texas. [Pl.'s Ex. 5, at A0666; Boyd, Trial Tr. 30:10-12, Oct. 28, 2013, Rec. Doc.

      323; Fleischman, Trial Tr. 500:7-9, Oct. 30, 2013, Rec. Doc. 350; Juba, Trial Tr.

      746:5-18, Oct. 31, 2013, Rec. Doc. 352].

11.   Former defendant GATT was and is, to the extent it still exists, a Delaware corporation

      with a principal place of business in Austin, Texas. [*See, e.g.*, Pl.'s Ex. 13, at A0573].

      **b.    Background**

12.   In March of 2001, Boyd was a GATT director and Fleischman was a GATT shareholder

      who sometimes attended GATT board meetings. [Boyd, Trial Tr. 69:4-6, Oct. 28, 2013,

      Rec. Doc. 323; Fleischman, Trial Tr. 508:4-25, Oct. 30, 2013, Rec. Doc. 350].

13.   At a GATT board meeting in March of 2001, Boyd and Fleischman learned that GATT

      was facing financial difficulties. [Boyd, Trial Tr. 372:21-373:2, Oct. 29, 2013, Rec. Doc.

      349; Fleischman, Trial Tr. 510:4-511:5, Oct. 30, 2013, Rec. Doc. 350].

14.   After the March 2001 board meeting, Boyd and Fleischman discussed the prospect of

      acting as consultants for GATT. [Boyd, Trial Tr. 378:9-12, Oct. 29, 2013, Rec. Doc.

349]. On or around April 2, 2001, Boyd and Fleischman began acting as consultants for GATT. [Pl.'s Exs. 9-10; Boyd, Trial Tr. 67:5-7, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial Tr. 527:13-15, Oct. 30, 2013, Rec. Doc. 350].

15.     After they began working as consultants, both Boyd and Fleischman extended personal lines of credit to GATT.[6] [Boyd, Trial Tr. 35:13-36:20, Oct. 28, 2013, Rec. Doc. 323].

16.     GATT, through its President Juba, executed promissory notes dated May 24, 2001 (1) in favor of Boyd in exchange for a $90,000 revolving line of credit [Pl.'s Ex. 11; Boyd, Trial Tr. 151:11-13, Oct. 28, 2013, Rec. Doc. 323] and (2) in favor of Fleischman in exchange for an $80,000 revolving line of credit [Pl.'s Ex. 12; Fleischman, Trial Tr. 556:11-13, Oct. 30, 2013, Rec. Doc. 350].

17.     GATT, through its President Juba, executed promissory notes dated July 18, 2001 in favor of Boyd and Fleischman, each in exchange for a $100,000 revolving line of credit. [Pl.'s Exs. 13-14; Boyd, Trial Tr. 159:3-16, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial Tr. 569:16-18, Oct. 30, 2013, Rec. Doc. 350].

18.     GATT, through its President Juba, entered into a security agreement dated July 18, 2001 (the "security agreement") with Boyd and Fleishman that was intended to secure GATT's indebtedness to Boyd and Fleischman under the May 24, 2001 and July 18, 2001 promissory notes. [Pl.'s Ex. 15].

19.     The security agreement provided Boyd and Fleischman with a security interest in all of GATT's tangible and intangible assets, including accounts, goods, merchandise, equipment, 65% of the capital stock of GATT UK, contract rights, choses in action, trade

---

[6] Although it has no reason to doubt their trial testimony, the Court did not consider Boyd and Fleischman's motives in providing the lines of credit. Their motives, while arguably relevant in a fraud theory of successor liability, were not before the Court, that theory having been disposed of by Judge Squatrito [Rec. Doc. 207 at 20-23] and affirmed by the Second Circuit. *Call Ctr*, 635 F.3d. at 52. Boyd and Fleischman's lines of credit to GATT were relevant to the Court's consideration of successor liability under the continuity of enterprise theory as they formed the basis for Interline's acquisition of GATT's assets at the foreclosure sale.

names, goodwill, and customer lists. [Pl.'s Ex. 15, at A0558-A0560; Boyd, Trial Tr. 167:12-168:19, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial. Tr. 571:2-5, Oct. 30, 2013, Rec. Doc. 350; Juba, Trial Tr. 833:7-14, Oct. 31, 2013, Rec. Doc. 353].

20. The security agreement gave Boyd and Fleischman a second lien on GATT's assets, giving them priority over all of GATT's creditors with the exception of Wells Fargo, which had a first lien on GATT's assets. [Boyd, Trial Tr. 45:21-24, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial. Tr. 585:5-9, 588:4-14, Oct. 30, 2013, Rec. Doc. 351].

21. GATT's finances did not significantly improve and it did not repay Boyd and Fleischman on their May 24, 2001 or July 18, 2001 lines of credit. After September 11, 2001 and its impact on the travel industry, Boyd and Fleischman informed Juba near the end of September 2001 that they were going to resign as consultants and attempt to foreclose on GATT's assets because they believed GATT would never be in a financial position to repay them. [Boyd, Trial Tr. 43:3-25, Oct. 28, 2013, Rec. Doc. 323; Juba, Trial Tr. 850:5-23, Oct. 31, 2013, Rec. Doc. 353].

22. On October 9, 2001, Boyd and Fleischman, through their attorneys, each sent to GATT, through its President Juba, a notice of Intent to Accelerate and Demand Payment of their respective May 24, 2001 and July 18, 2001 lines of credit. [Pl.'s Exs. 16-17; Boyd, Trial Tr. 191:14-23, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial. Tr. 607:7-15, 609:5-14, Oct. 30, 2013, Rec. Doc. 351].

23. On October 15, 2001, Boyd incorporated Interline Travel and Tour, Inc. [Boyd, Trial Tr. 202:2-4, Oct. 28, 2013, Rec. Doc. 323].

24. On October 19, 2001, Boyd and Fleischman transferred and assigned their promissory notes from the May 24, 2001 and July 18, 2001 lines of credit and their security interests

in GATT's assets to Interline. [Pl.'s Exs. 18-19]. In exchange, Boyd and Fleischman each received $10 and a note due from Interline in the amount of $170,000. [Boyd, Trial Tr. 203:1-204:8, 205:23-206:8, Oct. 28, 2013, Rec. Doc. 323].

25.     On October 19, 2001, Interline, through its attorney, sent GATT, through its President Juba, a Notice of Acceleration and Demand for Payment and Notice of Foreclosure, stating that Interline intended to conduct a foreclosure sale of GATT's assets if the amounts GATT owed under the May 24, 2001 and July 18, 2001 notes were not paid in full by October 29, 2001. [Pl.'s Ex. 20; Boyd, Trial Tr. 206:15-207:6, Oct. 28, 2013, Rec. Doc. 323].

26.     Between October 22-24, 2013, Interline sent Notices of Disposition of Collateral to GATT's secured creditors of record, Dell Financial Services [Pl.'s Ex. 23], IBM Corporation [Pl.'s Ex. 24], and Wells Fargo Bank Texas, N.A. [Pl.'s Ex. 25], notifying these creditors of the forthcoming foreclosure sale of GATT's assets.

27.     Between October 24-28, 2001, Interline published a notice of the public foreclosure sale of GATT's assets in the *Austin American Statesman*. [Pl.'s Ex. 21; Boyd, Trial Tr. 211:12-14, Oct. 28, 2013, Rec. Doc. 323].

28.     On October 30, 2001, a foreclosure sale of GATT's assets was conducted at the Travis County Courthouse in Austin, Texas. [Pl.'s Ex. 27, at A0642; Boyd, Trial Tr. 249:2-7, Oct. 29, 2013, Rec. Doc. 326].

29.     On October 30, 2001, prior to the foreclosure sale, Boyd purchased Wells Fargo's first lien on GATT's assets for $105,000. [Pl.'s Ex. 26; Boyd, Trial Tr. 244:10-23, Oct. 29, 2013, Rec. Doc. 326]. Boyd later assigned the Wells Fargo lien to Interline in exchange

for a note in the amount of $105,000. [Boyd, Trial Tr. 244:17-246:8, Oct. 29, 2013, Rec. Doc. 326].

30.    At the foreclosure sale Interline, through its President Boyd, purchased GATT's assets for $340,000,[7] at which time all of GATT's tangible and intangible assets became the property of Interline. [Pl.'s Ex. 27; Boyd, Trial Tr. 246:9-14, Oct. 29, 2013, Rec. Doc. 326].

**c.    Facts Establishing Successor Liability Under the Continuity of Enterprise Theory**

**i.    Continuity of Management**

31.    GATT had a decentralized management style in which duties were regularly delegated to a number of managers. [Boyd, Trial Tr. 408:22-409:16, Oct. 29, 2013, Rec. Doc. 349]. At Interline, Boyd and Fleischman have used a centralized management approach in which they oversee every aspect of the business, but also have a distinct group of upper-level employees with more responsibilities than general employees and who assist Boyd and Fleischman in managing Interline. [Boyd, Trial Tr. 410:9-22, Oct. 29, 2013, Rec. Doc. 349; Fleischman, Trial Tr. 628:23-630:11, Oct. 30, 2013, Rec. Doc. 351; Juba, Trial Tr. 871:20-873:1, Nov. 1, 2013, Rec. Doc. 355].

32.    Within days of the foreclosure sale, GATT's remaining officers as of the time of the foreclosure, Juba (GATT President and Chief Operating Officer), Cruz-Silva (GATT Senior Vice President), and Macchi (GATT Vice President of Cruise Sales and Marketing), were hired by Interline; each of these prior GATT officers was given a management title at Interline within approximately two months of the foreclosure sale.

---

[7] Although of no moment, the trial transcript records this figure as "$360,000," [*See* Boyd, Trial Tr. 250, Oct. 29, 2013, Rec. Doc. 326], which appears to be an error in transcription. [*See* Pl.'s Ex. 27, at 1 (recording the purchase price as $340,000)].

[Pl.'s Ex. 5, at A0669; Boyd, Trial Tr. 58:11-23, Oct. 29, 2013, Rec. Doc. 323; Boyd, Trial Tr. 291:3-18, Oct. 29, 2013, Rec. Doc. 326; Fleischman, Trial Tr. 616:6-22, Oct. 30, 2013, Rec. Doc. 351].

33.  Interline did not hire every individual who held a managerial or supervisory role at GATT: Jeff Lucich (GATT's Director of Marketing), Glenn Outon (a GATT reservation supervisor and wedding trip manager), Sergio Escobedo (a GATT reservations manager), and Lisa Houston (GATT's Controller) were not hired by Interline. None of these individuals were GATT officers. [Juba, Trial Tr. 877:25-878:16, Nov. 1, 2013, Rec. Doc. 355; *see* Pl.'s Ex. 6, at 24 (listing officers and officer titles)].

34.  Robert Roe, GATT's former Chief Financial Officer, who had no involvement with GATT beyond his resignation from that position in March or April of 2001, and Robert Rader, who had no involvement with GATT after resigning from the board on June 2, 2001, have never been involved with Interline. [Boyd, Trial Tr. 171:17-21, Oct. 28, 2013, Rec. Doc. 323; Juba, Trial Tr. 769:1-8, Oct. 31, 2013, Rec. Doc. 352; Macchi, Trial Tr. 1029:16-18, Nov. 14, 2013, Rec. Doc. 356].

35.  At the time of the foreclosure sale, GATT's former Chief Executive Officer Matthew O'Hayer (referred to hereinafter as "O'Hayer") was the Chairman of GATT's board and a GATT consultant, having resigned as Chief Executive Officer on June 14, 2001. [Pl.'s Ex. 8, at A0551; Juba, Trial Tr. 772:3-7, Oct. 31, 2013, Rec. Doc. 352].

36.  O'Hayer has never been involved in managing Interline, but Interline signed a consulting agreement with him in order to prevent him from using his knowledge from his involvement with GATT to compete with Interline's business. [Boyd, Trial Tr. 292:4-6,

Oct. 29, 2013, Rec. Doc. 326; Fleischman, Trial Tr. 623:6-624:10, Oct. 30, 2013, Rec. Doc. 351].

37.     Boyd has been President of Interline at all times since its founding on October 15, 2001. [Boyd, Trial Tr. 55:13-15, Oct. 28, 2013, Rec. Doc. 323].

38.     Boyd was a director of GATT from 1998 until June 2, 2001. [Pl.'s Ex. 8, at 2; Boyd, Trial Tr. 55:23-24, Oct. 28, 2013, Rec. Doc. 323]. While a director of GATT, Boyd served as chairman of GATT's audit committee and a member of GATT's compensation committee. [Pl.'s Ex. 6, at 25; Boyd, Trial Tr. 62:9-18, Oct. 28, 2013, Rec. Doc. 323].

39.     Fleischman has been Chairman and Chief Executive Officer of Interline at all times since its founding on October 15, 2001. [Pl.'s Ex. 5, at AO669; Fleischman, 487:17-488:1, Oct. 30, 2013, Rec. Doc. 350].

40.     Although he was not a member of GATT's board of directors, Fleischman sometimes attended GATT board meetings where he received information about the company and shared his opinions on issues facing the board. [Fleischman, Trial Tr. 507:5-509:6, Oct. 30, 2013, Rec. Doc. 350].

41.     After a March 2001 board meeting in which they learned that GATT was facing financial difficulties, Boyd and Fleischman discussed the prospect of acting as consultants for GATT and on or around April 2, 2001, Boyd and Fleischman[8] began acting as consultants for GATT. [Pl.'s Exs. 9-10; Boyd, Trial Tr. 67:5-7, Oct. 28, 2013, Rec. Doc. 323; Boyd, Trial Tr. 378:9-12, Oct. 29, 2013, Rec. Doc. 349; Fleischman, Trial Tr. 510:4-511:5, 518:2-519:16, 521:9-14, 527:13-18, Oct. 30, 2013, Rec. Doc. 350].

---

[8] Fleischman entered into the consulting agreement with GATT through his company, Capital Vision Group, of which he was the only employee. [Pl.'s Ex. 10; Fleischman, Trial Tr. 528:2-10, Oct. 30, 2013, Rec. Doc. 350].

42. As a consultant, Boyd was involved with GATT's accounting, which included sorting through financial records and attempting to restructure debentures. [Boyd, Trial Tr. 130:10-132:14, 134:22-135:19, 189:17-19, Oct. 28, 2013, Rec. Doc. 323].

43. As a consultant, Fleischman was involved with GATT's operations, including renegotiating GATT's debts and ability to sell under agreements with hotels, raising cash to operate the business, assessing employee numbers, and advising on merchandise pricing. [Fleischman, Trial Tr. 594:22-596:14, 645, Oct. 31, 2013, Rec. Doc. 351; Juba, Trial Tr. 827:19-22, Oct. 31, 2013, Rec. Doc. 353].

44. As the principal managers of Interline, Boyd and Fleischman work in the same areas in which they formerly advised GATT, although they now play stronger role**s**; Boyd handles the financial side of the business and Fleischman handles the operational side of the business, including negotiating deals with hotels, raising cash to operate the business, training employees, and managing how employees buy and price goods. [Fleischman, Trial Tr. 629:11-630:6, 642:2-18, Oct. 30, 2013, Rec. Doc. 351].

45. Juba was President and Chief Operating Officer of GATT through the time of the foreclosure sale. [Boyd, Trial Tr. 58:17-18, Oct. 28, 2013, Rec. Doc. 323; Juba, Trial Tr. 815:2-8, Oct. 31, 2013, Rec. Doc. 353; Juba, Trial Tr. 873:4-6, Nov. 1, 2013, Rec. Doc. 355].

46. Juba was hired by Interline as an employee the day after the foreclosure sale and received the title Executive Vice President at Interline approximately two months later, on or around January 1, 2002. [Pl.'s Ex. 5, at A0670; Boyd, Trial Tr. 58:14-23, Oct. 28, 2013, Rec. Doc. 323; Juba, Trial Tr. 723:21-23, Oct. 31, 2013, Rec. Doc. 352].

47. At GATT, Juba had daily operational management responsibilities, made hiring decisions, and had employees reporting directly to him. [Juba, Trial Tr. 873:7-19, Nov. 1, 2013, Rec. Doc. 355]. Interline utilized Juba's managerial experience from GATT; he initially spent most of his time advising Boyd and Fleischman on systems, protocol, and other aspects of the travel business with which Juba was familiar from his experience as President and Chief Operating Officer of GATT and eventually was given more direct managerial responsibilities. [Juba, Trial Tr. 874:20-875:12, Nov. 1, 2013, Rec. Doc. 355].

48. Cruz-Silva was GATT's Senior Vice President through the time of the foreclosure sale. [Cruz-Silva, Trial Tr. 956:5-12, Nov. 1, 2013, Rec. Doc. 355].

49. Within days of the foreclosure sale, Cruz-Silva was hired by Interline as a part-time employee, based on his desire not to work full time because of personal circumstances; he received the title Senior Vice President at Interline approximately two months later, on or around January 1, 2002. [Pl.'s Ex. 5, at A0670; Fleischman, Trial Tr. 622:13-19, Oct. 30, 2013, Rec. Doc. 351; Cruz-Silva, Trial Tr. 979:19-23, 981:6-11, Nov. 1, 2013, Rec. Doc. 354].

50. At both GATT and Interline, Cruz-Silva's job focused on promoting and maintaining relationships and agreements with hotels.[9] [Juba, Trial Tr. 757:7-16, Oct. 31, 2013, Rec. Doc. 352; Cruz-Silva, Trial Tr. 927:16-25, 943:5-944:16, Nov. 1, 2013, Rec. Doc. 355; Cruz-Silva, Trial Tr. 989:17-990:9, Nov. 1, 2013, Rec. Doc. 354].

51. Macchi was GATT's Vice President of Cruise Sales and Marketing through the time of the foreclosure sale. [Boyd, Trial Tr. 265:14-25, Oct. 29, 2013, Rec. Doc. 326].

---

[9] At GATT, Cruz-Silva's dealings with hotels also included soliciting advertisement sales. [Cruz-Silva, Trial Tr. 968:1-12, Nov. 1, 2013, Rec. Doc. 354].

52. Macchi was hired by Interline as an employee within days of the foreclosure sale and received the title Vice President at Interline approximately two months later, on or around January 1, 2002. [Pl.'s Ex. 5, at A0670; Boyd, Trial Tr. 265:14-22, Oct. 29, 2013, Rec. Doc. 326; Macchi, Trial Tr. 1016:10-15, Nov. 14, 2013, Rec. Doc. 356].

53. At GATT, Macchi maintained relationships with cruise lines, negotiated contracts with cruise lines, gathered cruise line content for publications, and wrote for GATT's publications until the time the publications ceased in June 2001 due to economic considerations. [Boyd, Trial Tr. 106:2-14, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial Tr. 683:11-21, Oct. 31, 2013, Rec. Doc. 352; Macchi, Trial Tr. 1037:11-1039:2, Nov. 14, 2013, Rec. Doc. 356]. At Interline, Macchi's job still focuses on maintaining relationships with cruise lines; she also performs jobs that are similar to what she did for GATT's publications by gathering cruise line content for customer emails and writing articles for publication on Interline's online blog. [Macchi, Trial Tr. 1037:18-1038:14, 1039:6-23, 1041:9-21, Nov. 14, 2013, Rec. Doc. 356].

### ii. Continuity of Personnel

54. With the exception of Boyd and Fleischman, who founded the company, Interline had no employees prior to or immediately after the foreclosure sale. [Boyd, Trial Tr. 285:25-286:7, Oct. 29, 2013, Rec. Doc. 326].

55. All of Interline's initial hires, who began working for Interline within approximately two days of the foreclosure sale, had been GATT employees at the time of the foreclosure sale. [Boyd, Trial Tr. 286:4-7, Oct. 29, 2013, Rec. Doc. 326; Fleischman, Trial Tr. 618:1-11, Oct. 30, 2013, Rec. Doc. 351; Juba, Trial Tr. 752:9-12, Oct. 31, 2013, Rec. Doc. 352].

56.     Prior to the foreclosure sale, starting in approximately April 2001, GATT had laid off a majority of its employees and by the time of the foreclosure sale in October 2001 it had only approximately 30 employees. [Def.'s Ex. EE; Boyd, Trial Tr. 201:20-21, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial Tr. 600:17-601:7, Oct. 30, 2013, Rec. Doc. 351].

57.     Within two days of the foreclosure sale, Interline formally hired the majority of GATT's employees, approximately 21 individuals.[10] Subsequently, Interline hired approximately twelve more individuals who had previously worked for GATT. [Pl.'s Ex. 5, at A0675; Boyd, Trial Tr. 287:3-20, Oct. 29, 2013, Rec. Doc. 326; Juba, Trial Tr. 752:5-8, Oct. 31, 2013, Rec. Doc. 352].

58.     There was no formal application process for or form to be completed by former GATT employees who wanted to work at Interline following the foreclosure sale; Boyd and Fleischman informed GATT employees they would not be offered jobs unless they submitted a formal resignation to GATT. If a former GATT employee took a job with Interline, he or she then had to fill out new employment paperwork. [Boyd, Trial Tr. 289:5-290:9, Oct. 29, 2013, Rec. Doc. 326].

59.     Other than the employees in managerial or higher-level positions, the majority of employees at both GATT and Interline worked as call center agents. [Boyd, Trial Tr. 288:17-21, Oct. 29, 2013, Rec. Doc. 326; Juba, Trial Tr. 795:24-796:2, Oct. 31, 2013, Rec. Doc. 353].

---

[10] Former GATT employees hired by Interline included Churl Yo, who worked on GATT's publications and then became creative director for Interline, and Jane Edwards, a former GATT employee who eventually took a higher-level position in Interline's hotel business. [Pl.'s Ex. 36, Churl Yo Dep., at 9:4-12, 18:5-7; Fleischman, Trial Tr. 703:24-704:12, Oct. 31, 2013, Rec. Doc. 352].

60.     For at least four years[11] after the foreclosure sale, more than half of Interline's employees were former GATT employees. [Pl.'s Ex. 5, at A0668; Pl.'s Ex. 37, at ¶ 81].

### iii.     Continuity of Physical Location

61.     Prior to the foreclosure sale, GATT's main office was operated out of the ninth and eleventh floors of a building located at 211 East 7th Street in Austin, Texas and used the address "211 East 7th Street, 11th Floor, Austin, Texas, 78701." [Pl.'s Exs. 11-12; Boyd, Trial Tr. 261:21-22, Oct. 29, 2013, Rec. Doc. 326].

62.     Prior to the foreclosure sale, GATT had reduced its staff and operations and was not using all the space it had leased on the ninth and eleventh floors at 211 East 7th Street. [Boyd, Trial Tr. 299:13-18, Oct. 29, 2013, Rec. Doc. 326].

63.     After the foreclosure sale, on November 1, 2013, Interline entered into a lease with GATT's landlord to lease a portion of the space on the eleventh floor at 211 East 7th Street that had been occupied by GATT prior to the foreclosure sale. [Def.'s Ex. V; Boyd, Trial Tr. 298:12-23, Oct. 29, 2013, Rec. Doc. 326].

64.     Interline remained at the 211 East 7th Street building that had been used by GATT for approximately seven months following the foreclosure sale, until May 2002. [Juba, Trial Tr. 743:5-12, Oct. 31, 2013, Rec. Doc. 352].

65.     Prior to the foreclosure sale, GATT also operated a small office at 1499 West Palmetto Road in Boca Raton, Florida; the Florida office was operated out of suite 222 of this building until the summer of 2001, at which time the office was moved to a less

---

[11] Evidence pertaining to the percentage of Interline employees who previously worked for GATT is probative only through May 19, 2006. [Rec. Doc. 344]. The Court finds this period of time to be more than sufficient in order to compare Interline's personnel following foreclosure to GATT's personnel prior to foreclosure. *See infra Conclusions of Law* ¶ 10.

expensive space in the basement of the same building. [Macchi, Trial Tr. 1046:10-1047:4, Nov. 14, 2013, Rec. Doc. 356].

66.     Following the foreclosure sale, Interline operated a small Florida office from the same space in the basement of 1499 West Palmetto Road, Boca Raton, Florida that GATT had previously occupied. [Macchi, Trial Tr. 1051:20-22, Nov. 14, 2013, Rec. Doc. 356].

67.     Interline operated the Florida office from the West Palmetto Road location until 2007, when Macchi began working from home. [Macchi, Trial Tr. 1090:3-9, Nov. 14, 2013, Rec. Doc. 356].

68.     After the foreclosure sale, Interline did not lease or use any space that had not been leased or used by GATT prior to the foreclosure sale. *See Findings of Fact* ¶¶ 61-67.

### iv.     Continuity of Assets and Liabilities

69.     At the time of its October 15, 2001 incorporation, Interline's only asset was approximately $4,000 paid in capital. [Boyd, Trial Tr. 204:12-15, Oct. 28, 2013, Rec. Doc. 323].

70.     Immediately prior to the October 30, 2001 foreclosure sale, Interline's only assets were the approximately $4,000 in capital and the security interest in 100% of GATT's assets that Boyd and Fleischman had transferred to Interline. [Boyd, Trial Tr. 227:18-228:10, Oct. 29, 2013, Rec. Doc. 326; Fleischman, Trial Tr. 617:4-15, Oct. 30, 2013, Rec. Doc. 351].

71.     Immediately following the October 30, 2001 foreclosure sale, Interline's only assets were the approximately $4,000 in capital, GATT's tangible and intangible assets, and assets that GATT had been leasing or owned subject to debts at the time of foreclosure and

which Interline continued to use subject to negotiations with the lender or debtor.[12]

[Boyd, Trial Tr. 231:19-232:14, 274:19-275:7, Oct. 29, 2013, Rec. Doc. 326].

72.   Due to the nature of GATT's business, many of the assets Interline acquired in the foreclosure sale were intangible assets, including customer lists and good will associated with GATT's trade names.[13] [Juba, Trial Tr. 751:9-23, Oct. 31, 2013, Rec. Doc. 352; Cruz-Silva, Trial Tr. 951:12-17, Nov. 1, 2013, Rec. Doc. 355; Macchi, Trial Tr. 1086:6-8, Nov. 14, 2013, Rec. Doc. 356].

73.   Following the foreclosure sale, Interline used the customer list it had acquired from GATT and which GATT had used in its interline travel business.[14] [Boyd, Trial Tr. 280:12-14, Oct. 29, 2013, Rec. Doc. 326; Fleischman, Trial Tr. 711:8-14, Oct. 31, 2013, Rec. Doc. 352].

74.   Following the foreclosure sale, Interline used many of the same toll-free telephone numbers used by GATT, including 888-PERX-COM and 888-PERX-NOW. [Boyd, Trial Tr. 283:11-15, Oct. 29, 2013, Rec. Doc. 326; Juba, Trial Tr. 789:13-16 Oct. 31, 2013, Rec. Doc. 352]. Interline began using these numbers immediately after the foreclosure sale and shortly thereafter was able to switch the telephone numbers into telephone

---

[12] In November and December 2001, following the foreclosure sale, Boyd and Fleischman raised approximately one million dollars in additional capital for Interline from their friends and family. [Boyd, Trial Tr. 54:12-15, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial Tr. 652:9-13, Oct. 30, 2013, Rec. Doc. 351]. None of this additional capital was used and it was redistributed to the investors approximately the following year. [Fleischman, Trial Tr. 691:1-15, Oct. 31, 2013, Rec. Doc. 352].

[13] Due to GATT's financial difficulties prior to the foreclosure sale, some of the intangible assets acquired by Interline at the time of the foreclosure may not have been as valuable as they once were. [Boyd, Trial Tr. 44:1-5, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial Tr. 633:22-25, Oct. 30, 2013, Rec. Doc. 351]. The Court finds that these assets were bought by Interline and then used in its efforts to run an interline travel company. The Court need not, and does not, ascertain the precise worth of the assets.

[14] Fleischman testified that Interline did not use customer listings unless they had an accompanying email address and that some Interline customers were not on the GATT customer list because "[c]ertainly every day, there's new customers," calling in. [Fleischman, Trial Tr. 750:3-4, Oct. 31, 2013, Rec. Doc. 352]. The Court does not suggest that Interline sold services only to individuals who appeared on GATT's customer list or that it sold to every individual on this list, but rather finds that Interline used the customer list as a marketing tool for interline travel services.

company accounts under Interline's name. [Boyd, Trial Tr. 282:16-283:8, Oct. 29, 2013, Rec. Doc. 326; Juba, Trial Tr. 749:17-19, Oct. 31, 2013, Rec. Doc. 353].

75.     Following the foreclosure sale, Interline used the web address that was associated with GATT's interline travel business, www.perx.com, as its primary web address, although Interline changed at least some content on the website. [Boyd, Trial Tr. 283:24-284:6, Oct. 29, 2013, Rec. Doc. 326; Juba, Trial Tr. 751:5-8, Oct. 31, 2013, Rec. Doc. 352].

76.     Following the foreclosure sale, Interline used the same company email addresses, containing the "perx.com" domain name, which GATT had used; Interline employees who had worked for GATT kept their same email addresses. [Boyd, Trial Tr. 284:7-11, Oct. 29, 2013, Rec. Doc. 326; Juba, Trial Tr. 750:10-17, Oct. 31, 2013, Rec. Doc. 352; Cruz-Silva, Trial Tr. 937:19-23, Nov. 1, 2013, Rec. Doc. 355; Macchi, Trial Tr. 1043:17-22, Nov. 14, 2013, Rec. Doc. 356].

77.     Following the foreclosure sale, Interline used all or a majority of the same office furniture used by GATT. [Boyd, Trial Tr. 428:22-25, Oct. 29, 2013, Rec. Doc. 349; Juba, Trial Tr. 749:6-10, Oct. 31, 2013, Rec. Doc. 352; Cruz-Silva, Trial Tr. 937:5-11, Nov. 1, 2013, Rec. Doc. 355; Macchi, Trial Tr. 1051:24-1052:1, Nov. 14, 2013, Rec. Doc. 356].

78.     Following the foreclosure sale, Interline used many of the same office machines and computers used by GATT. [Boyd, Trial Tr. 279:1-6, Oct. 29, 2013, Rec. Doc. 323]. Most of the office machines and computers in use by GATT at the time of foreclosure were in GATT's possession pursuant to lease or debtor relationships and Interline gained immediate possession of the equipment following the foreclosure sale; in some cases Interline then negotiated with the owner to purchase or lease the equipment and in some cases the owner later took possession of the equipment. [Boyd, Trial Tr. 428:11-15, Oct.

29, 2013, Rec. Doc. 349; Juba, Trial Tr. 749:11-13, Oct. 31, 2013, Rec. Doc. 352; Cruz-Silva, Trial Tr. 937:5-11, Nov. 1, 2013, Rec. Doc. 355; Macchi, Trial Tr. 1079:22-1080:1, Nov. 14, 2013, Rec. Doc. 356].

79.    Following the foreclosure sale, Interline used the same telephone system that GATT was using at the time of the foreclosure sale.[15] [Boyd, Trial Tr. 281:19-22, Oct. 29, 2013, Rec. Doc. 326; Macchi, Trial Tr. 1080:10-13, Nov. 14, 2013, Rec. Doc. 356].

80.    Following the foreclosure sale, Interline used the same reservation computer software that GATT was using at the time of the foreclosure. [Boyd, Trial Tr. 280:5-11, Oct. 29, 2013, Rec. Doc. 326].

81.    At the foreclosure sale, Interline acquired an inventory of unsold hotel room stays that GATT had obtained through advertising barter arrangements with hotels; Interline then sold at least some of these rooms as part of its interline travel business. [Boyd, Trial Tr. 454:3-15, 456:6-23, Oct. 30, 2013, Rec. Doc. 350].

82.    In November and December 2001, Interline gave employees who had formerly worked for GATT vacation time based on vacation time they had accrued while working for GATT; Interline treated this vacation time as a $15,292.07 loss assumed by the acquisition of GATT's assets. [Pl.'s Ex. 28 (recording a loss of $15,292.07 for "Accrued Vacation" in an accounting list of assets acquired at the foreclosure sale); Boyd, Trial Tr. 308:8-16, Oct. 29, 2013, Rec. Doc. 326].

83.    Interline treated GATT's deferred hotel and cruise revenue as liabilities acquired during the foreclosure sale. [Pl.'s Ex. 28; Boyd, Trial Tr. 319:3-15, Oct. 29, 2013, Rec. Doc. 326].

---

[15] At the time of the foreclosure sale, GATT was using an Avaya telephone system, which is not the call center system related to the underlying contract dispute pending in state court that is the genesis of this litigation. [Boyd, Trial Tr. 429:4-5, Oct. 29, 2013, Rec. Doc. 349].

84.     Following the foreclosure sale, many GATT customers who had paid GATT deposits for
        travel reservations contacted Interline, who continued using and answering phone
        numbers GATT had used. [Boyd, Trial Tr. 52:8-12, Oct. 28, 2013, Rec. Doc. 323].
        Interline did not recognize precise deposit amounts customers had paid to GATT, but did
        offer these customers discounts on travel with Interline to encourage them to use
        Interline's services. [Boyd, Trial Tr. 52:18-53:9, Oct. 28, 2013, Rec. Doc. 323].

85.     In one instance, Interline paid a hotel $621.30, the full reservation amount for a travel
        reservation that had been paid to GATT but had not been paid to the hotel. [Pl.'s Ex. 28;
        Boyd, Trial Tr. 316:10-23, Oct. 29, 2013, Rec. Doc. 326].

                        v.      Continuity of Business Operations

86.     Prior to the foreclosure sale, GATT's primary business was selling vacation reservations
        to interliners.[16] [Boyd, Trial Tr. 82:25-83:4, 84:22-25, Oct. 28, 2013, Rec. Doc. 323]. It
        also sold vacations to travel agents and honeymooners and offered wedding planning
        services,[17] although these areas were not as prominent as the interline vacation business.
        [Boyd, Trial Tr. 82:15-21, 105:1-15, Oct. 28, 2013, Rec. Doc. 323].

87.     At one time GATT published two magazines: one promoting interline vacation packages
        and the other targeting the wedding and honeymoon industry, but had stopped publishing
        both magazines in June 2001. [Boyd, Trial Tr. 98:10-99:8, 106:2-14, 117:7-8, Oct. 28,
        2013, Rec. Doc. 323; Boyd, Trial Tr. 463:6-11, Oct. 30, 2013, Rec. Doc. 350;
        Fleischman, Trial Tr. 593:23-594:10, Oct. 30, 2013, Rec. Doc. 351].

---

[16] Throughout the trial, "interliner" was used to refer to current and former airline employees and their family and friends. [*See, e.g.*, Juba, Trial Tr. 709:4-8, Oct. 31, 2013, Rec. Doc. 352].
[17] GATT also sold some airline tickets, although this was never a significant source of revenue for the company. [Boyd, Trial Tr. 461:11-15, Oct. 30, Rec. Doc. 350].

88.     While it was publishing travel magazines, GATT made barter agreements with hotels in

which the hotel would give GATT hotel room reservations to sell in exchange for

advertising space in its magazines. [Cruz-Silva, Trial Tr. 972:12-973:1, Nov. 1, 2013,

Rec. Doc. 354; Fleischman, Trial Tr. 674:3-9, Oct. 30, 2013, Rec. Doc. 351].

89.     GATT was in the business of selling hotel and cruise reservations[18] under net rate

agreements negotiated directly with hotels, resorts, and cruise lines, even during the

period of time in which it was actively involved in making barter arrangements and

publishing travel magazines. [Pl.'s Ex. 6, at 6; Boyd, Trial Tr. 465:9-11, Oct. 30, 2013,

Rec. Doc. 350].

90.     While GATT was engaged in the publishing, advertising and barter business, travel sales

were a higher percentage of revenue and the travel sales portion of the business was more

profitable than the publishing, advertising, and barter portion of the business. [Boyd,

Trial Tr. 122:2-15, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial Tr. 591:13-15,

600:10-16, Oct. 30, 2013, Rec. Doc. 351].

91.     At the time of the foreclosure sale, GATT was no longer publishing the two magazines it

had previously published[19] and the majority of its business consisted of selling vacations

to interliners. [Fleischman, Trial Tr. 597:9-15, Oct. 30, 2013, Rec. Doc. 351].

92.     The last time that GATT turned a monthly profit,[20] during July and August of 2001, the

majority of its revenue came from vacation sales to interliners. [Boyd, Trial Tr.

---

[18] GATT had always sold the majority of cruise line reservations pursuant to net rate agreements rather than barter arrangements because cruise lines were not as interested in barter transactions. [Macchi, Trial Tr. 1096:14-21, Nov. 14, 2013, Rec. Doc. 356].

[19] Interline has never published either of the two magazines previously published by GATT, although it does publish an advertising brochure. [Boyd, Trial Tr. 106:17-21, Oct. 28, 2013, Rec. Doc. 323].

[20] Boyd testified that during this time period he and Fleischman helped GATT go from a monthly loss of approximately $300,000 to turning a small profit by "discuss[ing] with [GATT] how they were doing their pricing on the travel products, and how they were getting their rates from their vendors . . . [and] how to increase their margins on their sales." [Boyd, Trial Tr. 111:5-9, Oct. 28, 2013, Rec. Doc. 323].

110:24-111:25, 117:9-13, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial Tr. 597:9-15, Oct. 30, 2013, Rec. Doc. 351].

93.     Immediately following the foreclosure sale, Interline's business consisted entirely of selling vacations to interliners. [Cruz-Silva, Trial Tr. 939:23-940:1, 947:19-21, Nov. 1, 2013, Rec. Doc. 355; Macchi, Trial Tr. 1071:14-19, Nov. 14, 2013, Rec. Doc. 356]. Like GATT, Interline negotiated net rate agreements with hotels, resorts, and cruise lines in order to sell vacations to interliners. [Boyd, Trial Tr. 92:24-93:6, Oct. 29, 2013, Rec. Doc. 323; Boyd, Trial Tr. 474:1-18, Oct. 30, 2013, Rec. Doc. 350].

94.     For at least a month after the foreclosure sale, Interline did not provide any services that GATT had not provided.[21] [Juba, Trial Tr. 784:6-9, Oct. 31, 2013, Rec. Doc. 353; Cruz-Silva, Trial Tr. 946:12-15, Nov. 1, 2013, Rec. Doc. 355; Macchi, Trial Tr. 1071:23-25, Nov. 14, 2013, Rec. Doc. 356].

95.     Prior and up to the foreclosure sale, GATT was actively involved in publishing a brochure that advertised vacation deals for interliners. [Pl.'s Ex. 36, Churl Yo Dep., at 18:15-20; Boyd, Trial Tr. 97:15-20, Oct. 28, 2013, Rec. Doc. 323]. GATT distributed this brochure in airline employee lounges through a network of airline employee contacts. [Juba, Trial Tr. 786:22-787:11, Oct. 31, 2013, Rec. Doc. 353].

96.     Following the foreclosure sale, Interline also published a brochure advertising vacation deals for interliners, which it distributed, as had GATT, in airline employee lounges using a network of airline employees, many of whom had previously distributed GATT's brochure. [Boyd, Trial Tr. 48:13-19, 50:25-51:20 Oct. 28, 2013, Rec. Doc. 323; Boyd,

---

[21] In early to mid 2002, Interline began selling vacation packages to FedEx employees and members of the military, which GATT had never done. [Boyd, Trial Tr. 421:13-25, Oct. 29, 2013, Rec. Doc. 349].

Trial Tr. 285:1-4, Oct. 29, 2013, Rec. Doc. 326; Juba, Trial Tr. 787:4-11, Oct. 31, 2013, Rec. Doc. 353; Juba, Trial Tr. 910:2-13, Nov. 1, 2013, Rec. Doc. 355].

97. Although Interline's brochure is smaller and the designs of the brochures are not identical, both GATT's *Interline Update* and Interline's brochure contained similar content[22] about vacation deals for interliners, were directed at the interline community, and were distributed in places frequented by the interline community. [Juba, Trial Tr. 786:22-787:7, Oct. 31, 2013, Rec. Doc. 353].

98. Prior to the foreclosure sale, GATT telephone agents answered customer calls by saying "Interline Travel Reps;" following the foreclosure sale, Interline telephone agents answered customer calls with the similar greeting: "Interline Vacations."[23] [Boyd, Trial Tr. 261:2-11, Oct. 29, 2013, Rec. Doc. 326; Fleischman, Trial Tr. 620:7-12, Oct. 30, 2013, Rec. Doc. 351; Juba, Trial Tr. 784:22-785:1, Oct. 31, 2013, Rec. Doc. 353].

99. On the morning of October 30, 2001, the day of the foreclosure sale, GATT's offices were open and GATT employees were carrying out GATT business, including answering calls from GATT customers. [Boyd, Trial Tr. 302:2-5, Oct. 28, 2013, Rec. Doc. 323; Juba, Trial Tr. 737:15-738:3, Oct. 31, 2013, Rec. Doc. 352; Juba, Trial Tr. 855:9-16, Oct. 31, 2013, Rec. Doc. 353].

100. On October 30, 2001, following the foreclosure sale, Boyd went to GATT's offices and informed a group of GATT employees that Interline had bought all of GATT's assets. [Boyd, Trial Tr. 254:15-255:1, 258:20-259:5, Oct. 29, 2013, Rec. Doc. 326]. At the time Boyd arrived at GATT's offices on October 30, 2001, GATT employees were still

---

[22] Additionally, the brochures were created using the same software, some of the same graphics, and at least in part by the same individual, Churl Yo. [Pl.'s Ex. 6, Churl Yo Dep., at 18:10-19:15].

[23] If a GATT customer called Interline after the foreclosure and asked about a reservation he or she had made with GATT, then the customer agent would explain that GATT had gone out of business and the customer was now calling Interline. [Boyd, Trial Tr. 422:15-21, Oct. 29, 2013, Rec. Doc. 349].

conducting GATT business. [Boyd, Trial Tr. 257:23-258:2, Oct. 29, 2013, Rec. Doc. 326].

101.   Sometime on October 30, 2001, the day of the foreclosure sale, GATT ceased operations and went out of business. [Pl.'s Ex. 36, Churl Yo Dep., at 63:10-13; Juba, Trial Tr. 742:8-10, Oct. 31, 2013, Rec. Doc. 352; Macchi, Trial Tr. 1079:17-19, Nov. 14, 2013, Rec. Doc. 356].

102.   Interline began operating on October 31, 2001, the day following the foreclosure sale. [Cruz-Silva, Trial Tr. 942:11-12, Nov. 1, 2013, Rec. Doc. 355; Macchi, Trial Tr. 1079:17-21, Nov. 14, 2013, Rec. Doc. 356].

103.   Interline travel customers and employees who were associated with GATT on October 30, 2001 did not experience any meaningful break in services or employment between the time GATT went out of business and the time Interline began operations the following day. [Boyd, Trial Tr. 274:19-275:1, Oct. 29, 2013, Rec. Doc. 326; Juba, Trial Tr. 738:4-23, Oct. 31, 2013, Rec. Doc. 352; Macchi, Trial Tr. 1066:9-15, Nov. 14, 2013, Rec. Doc. 356].

104.   Although Boyd and Fleischman opened Interline accounts and negotiated new contracts with previous GATT vendors such as the telephone company, none of these changes required a break in operations because Interline operated under GATT's contracts until the new ones went into effect. [Boyd, Trial Tr. 282:5-22, Oct. 29, 2013, Rec. Doc. 326].

105.   Following the foreclosure sale, Interline employees who had previously worked for GATT continued to open mail addressed to them as GATT employees. [Fleischman, Trial Tr. 702:1-20, Oct. 31, 2013, Rec. Doc. 352; Cruz-Silva, Trial Tr. 941:19-24, Nov. 1, 2013, Rec. Doc. 355; Macchi, Trial Tr. 1064:11-19, Nov. 14, 2013, Rec. Doc. 356]. Mail

32

addressed only to GATT was forwarded to O'Hayer, GATT's Chairman of the Board. [Fleischman, Trial Tr. 701:18-25, 702:21-703:2, Oct. 31, 2013, Rec. Doc. 352].

106.   Following the foreclosure sale, Interline received calls from GATT customers, answered questions about reservations made with GATT, and dealt with complaints about GATT. [Boyd, Trial Tr. 52:8-12, Oct. 28, 2013, Rec. Doc. 323; Boyd, Trial Tr. 332:9-12, Oct. 29, 2013, Rec. Doc. 326; Cruz-Silva, Trial Tr. 942:24-943:1, Nov. 1, 2013, Rec. Doc. 355].

107.   Following the foreclosure sale and until Interline could negotiate new contracts with hotels and cruise lines, any sales Interline made used the rates from the hotel's or cruise line's rate contract with GATT. [Juba, Trial Tr. 755:9-20, Oct. 31, 2013, Rec. Doc. 352; Macchi, Trial Tr. 1078:16-23, Nov. 14, 2013, Rec. Doc. 356].

108.   Prior to the foreclosure sale, GATT was processing cruise line reservations by taking credit card information from the customer and giving it to the cruise line to charge and was processing hotel reservations by check only, as it had lost its credit card processing capabilities in September 2001; Interline processed reservations the same way until it was able to obtain credit card processing capabilities to book hotels approximately two months after it began operating. [Boyd, Trial Tr. 330:7-331:5, Oct. 29, 2013, Rec. Doc. 326; Fleischman, Trial Tr. 619:17-19, Oct. 30, 2013, Rec. Doc. 351; Macchi, Trial Tr. 1081:1-11. 1082:24-1083:7, Nov. 14, 2013, Rec. Doc. 356].

### vi.   Purpose of Forming Interline

109.   Boyd and Fleischman formed Interline while considering foreclosure on GATT's assets in order to have a corporate entity through which to operate and obtain value from

GATT's assets, should the foreclosure occur. [Boyd, Trial Tr. 43:3-19, 44:23-45:6, Oct. 28, 2013, Rec. Doc. 323; Fleischman, Trial Tr. 488:10-13, Oct. 30, 2013, Rec. Doc. 350].

110.    Boyd and Fleischman planned to continue operating GATT's interline travel business through Interline after the foreclosure sale. [Boyd, Trial Tr. 258:22-259:1, 296:1-2, Oct. 29, 2013, Rec. Doc. 326].

111.    In forming Interline in order to acquire GATT's assets, Boyd and Fleischman planned to employ many of GATT's employees. [Boyd Trial Tr. 289:5-290:12, Oct. 29, 2013, Rec. Doc. 326; Fleischman, Trial Tr. 614:5-7, Oct. 30, 2013, Rec. Doc. 351].

####     d.    Facts Going to Interline's Proffered Defense of Laches

112.    In August 2002, Call Center filed suit against GATT. [Vlahos, Trial Tr. 1179:6-7, Nov. 14, 2013, Rec. Doc. 356].

113.    At the time Call Center filed suit against GATT it was unaware that the October 2001 foreclosure sale had occurred or of Interline's existence. [Vlahos, Trial Tr. 1179:11-16, Nov. 14, 2013, Rec. Doc. 356].

114.    After filing suit against GATT, Call Center's President, Vlahos, learned of the existence of Interline and its connection to GATT; within weeks, Call Center added Interline as a defendant in its suit against GATT. [Vlahos, Trial Tr. 1179:12-23, Nov. 14, 2013, Rec. Doc. 356].

## VI.    Conclusions of Law

On February 19, 2009, United States District Court Judge Dominic J. Squatrito granted Interline's motion for summary judgment on the successor liability claim under both the fraud theory and the "mere continuation"[24] theory of successor liability. [Rec. Doc. 208]. On November 19, 2009, defendant GATT was dismissed from this action and Call Center's breach

---

[24] *See Findings of Fact* ¶ 6 n. 5.

of contract claim against GATT was remanded to the Connecticut Superior Court. [Rec. Doc. 230]. On March 11, 2011, the United States Court of Appeals for the Second Circuit affirmed the grant of summary judgment in favor of Interline on the fraud theory of successor liability, vacated the portion of Judge Squatrito's decision that granted summary judgment on the "mere continuation" theory of successor liability, and remanded the case to the District Court for proceedings consistent with the Circuit Court's-opinion. *Call Ctr. Techs., Inc. v. Grand Adventures Tour and Travel Publ'g. Corp.*, 635 F.3d 48, 55 (2d Cir. 2011). Accordingly, the only issue remaining at the time of trial was Call Center's successor liability claim against Interline under the continuity of enterprise theory. As instructed by the Second Circuit, the Court has also considered Interline's claim that the Court lacks personal jurisdiction over it. *Id.* at 55.

      **a.**     **Jurisdiction**

1.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.     In a diversity case, "personal jurisdiction is determined by the law of the state in which the district court sits. A defendant's conduct is sufficient for the exercise of personal jurisdiction if (1) the conduct satisfies the requirements of the Connecticut long-arm statute, and (2) the conduct satisfies the 'minimum contacts' requirement of the Due Process Clause of the Fourteenth Amendment." *Doe v. Ciolli*, 611 F. Supp. 2d 216, 220-21 (D. Conn. 2009) (citations omitted).

3.     This Court may exercise personal jurisdiction over Interline on the basis of Interline's successor liability to GATT, which required the Court to postpone its finding of personal jurisdiction until the Court's decision on successor liability was made. *See LiButti v.*

*United States*, 178 F.3d 114, 123-24 (2d Cir, 1999) (recognizing that personal jurisdiction may be established over a non-resident on the basis of successor liability). The Court concludes, for the reasons set out hereinafter, that Interline is subject to successor liability. Because Connecticut's long-arm statute and due process requirements would allow the Court to exercise personal jurisdiction over GATT in connection with the circumstances of this case,[25] the Court also has personal jurisdiction over Interline.

**b.     Law of the Case**

4.     In ruling on the case, the Court is bound by the Second Circuit's decision in *Call Center Technologies, Inc. v. Grand Adventures Tour & Travel Publishing Corp., et al.*, 635 F.3d 48 (2d Cir. 2011), which established the law of the case. Law of the case dictates that when a higher court "decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983) (citing *Southern Ry. Co. v. Clift*, 260 U.S. 316, 319 (1922); *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)). Thus, the Court has analyzed Call Center's successor liability claim using the continuity of enterprise factors as set out by the Second Circuit.

---

[25] On December 17, 2012, Judge Squatrito denied Interline's motion for summary judgment on the grounds that the Court lacked personal jurisdiction, holding that the Court would have personal jurisdiction over GATT in the event the Court later found in Call Center's favor on successor liability:

> The pertinent Connecticut long-arm statute provides in part that: "Every foreign corporation shall be: subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state . . . on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state . . . ." Conn. Gen. Stat. §33-929(f). Call Center has come forward with evidence demonstrating that it had a usual place of business in Connecticut and that its cause of action against GATT arose out of a contract made in Connecticut and performed in part in Connecticut. (Doc. #195, at 3-4, ¶¶ 10, 11, 16.) These facts satisfy the requirements of the Connecticut long-arm statute. . . . [T]he Court concludes that GATT had contacts with Connecticut such that it should have reasonably anticipated being haled into a court in Connecticut.

[Rec. Doc. 252].

5.     The "continuity of enterprise" theory, which is Connecticut's favored approach to the "mere continuation" exception to successor liability, provides that "'successor liability attaches where the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers.'" *Call Ctr.*, 635 F.3d at 53 (quoting *Kendall v. Amster*, 948 A.2d 1041, 1051 (Conn. App. Ct. 2008)).

6.     In determining whether successor liability exists under the continuity of enterprise theory, the Court has considered six relevant factors identified by the Second Circuit: 1) continuity of management, 2) continuity of personnel, 3) continuity of physical location, 4) continuity of assets and liabilities, 5) continuity of the general business operations of the companies, and 6) purpose of forming the alleged successor company. *Id.* at 53 ("the district court looked to the factors of 'management, personnel, physical location, assets and general business operations of the companies.'") (citing *Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp.*, 599 F. Supp. 2d 286, 294 (D. Conn. 2009)); *Id.* at 55 (finding that Boyd and Fleischman's purpose for forming Interline is a "circumstance [that] also supports a conclusion of continuity of enterprise").

7.     The 'purpose' factor allows the Court to consider Boyd and Fleischman's general purpose and intent for forming Interline, not the validity of or any possible fraudulent purpose associated with that decision. The Second Circuit affirmed summary judgment in Interline's favor on the fraud theory of successor liability**,** thus the Court has not considered the fraud theory, as it was not before the Court. *Id.* at 52.

8.     Plaintiffs do not need to prove a continuity of ownership in order to prevail on their successor liability claim. *Id.* at 53 ("Connecticut courts treat 'continuity of enterprise' as

their preferred version of the 'mere continuation' exception, essentially defining 'mere continuation' as 'continuity of enterprise,' . . . Connecticut courts do not view continuity of ownership as an essential requirement for a business to be deemed a mere continuation.") (internal quotation marks omitted) (citing *Medina v. Unlimited Sys., LLC*, 760 F. Supp. 2d 263, 270 (D. Conn. Dec. 15, 2010)).

9. In determining successor liability under the continuity of enterprise theory, the Court looks to "substance over form." *Id.* at 54.

10. When comparing GATT's and Interline's management, personnel, physical location, assets and liabilities, and business operations, the relevant time period is at or near the time of the foreclosure sale. There is no specific period of time that must be considered, but rather the Court looks generally at GATT and Interline as they existed prior to and following the foreclosure sale. *See Wells Fargo Bank, N.A. v. Konover*, 3:05-CV-1924(CFD), 2011 WL 1225986, at *19 n. 40 (D. Conn., March 28, 2011) ("the relevant time period for the successor liability analysis is . . . when [the predecessor] began the sale and transfer of its remaining assets to the Successor Defendants") (citing *Chamlink Corp. v. Merritt Extruder Corp. et al.*, 96 Conn. App. 183, 187 (2006)); *see also Miller v. Forge Mench P'ship*, No. 00 Civ. 4314, 2005 WL 267551, at *11 (S.D.N.Y. 2005) (applying the similar New York de facto merger theory of successor liability and finding that the relevant time period to consider is "the time of the asset sale at issue").

11. Plaintiff has the burden of proving successor liability by a preponderance of the evidence. *Sav. Bank of Manchester v. Daly*, No. CV020813164S, 2004 WL 3130581, at *3 (Conn. Super. Ct. Dec. 23, 2004).

12.   The Court must consider the balance of all relevant factors in determining successor

liability, but the plaintiff does not need to establish every single factor by a

preponderance of the evidence in order to prevail. *Mavel v. Scan-Optics, Inc.*, 509 F.

Supp. 2d 183, 189 (D. Conn. 2007) ("proponent of successor liability need not establish

all of these factors, [but] the balance must tip in his favor"); *see also Wells Fargo*, 2011

WL 1225986, at *19.

    **c.**    **Interline is Liable Under the Continuity of Enterprise Theory of Successor Liability**

        **i.**    **The Facts Establish Continuity of Management Between GATT and Interline**

13.   Evidence at trial established that there was continuity of management between GATT and

Interline. *Findings of Fact* ¶¶ 31-53. GATT's management prior to the foreclosure

consisted of Juba, Macchi, Cruz-Silva, and O'Hayer, with substantial involvement from

Boyd and Fleischman as consultants. *Findings of Fact* ¶¶ 32, 35, 41-43, 45, 48, 51.

Interline's management team after the foreclosure sale, although structured differently

from GATT's, consisted of Boyd, Fleischman, Juba, Macchi, and Cruz-Silva. *Findings of

Fact* ¶¶ 31-53. Although Juba, Macchi, and Cruz-Silva officially began their employment

at Interline as general employees without titles, they always had distinct responsibilities

from other employees that involved assisting Boyd and Fleischman with managing the

company and they each received officer titles approximately two months after they began

working at Interline. *Findings of Fact* ¶¶ 31-32, 46-47, 49-50, 52-53.

14.   Although O'Hayer was still participating in managing GATT at the time of the

foreclosure sale, he had resigned as Chief Executive Officer more than four months prior

to the sale. *Findings of Fact* ¶ 35. O'Hayer is the only identifiable member of GATT's

upper-level management team as of the time of the foreclosure sale who did not actively participate in Interline's management team. *Findings of Fact* ¶¶ 32, 35-36. Interline signed a consulting agreement with O'Hayer in order to prevent competition, but he had no further meaningful involvement with Interline and did not actually provide consulting services. *Findings of Fact* ¶ 36.

> ### ii. The Facts Establish Continuity of Personnel Between GATT and Interline

15.   In looking at continuity of personnel, the Court has considered GATT's entire staff prior to the foreclosure and Interline's entire staff following the foreclosure. GATT had begun to lay off employees approximately six months before the foreclosure sale and was functioning with a staff of approximately 30 employees by October 2001. *Findings of Fact* ¶ 56. Although GATT was, at one time, a much larger company than it was at the time of the foreclosure, the Court considers its employee pool at the time of the foreclosure to be the more relevant comparison point. *See, e.g.*, *Miller*, 2005 WL 267551, at *11 (comparing the predecessor's employees on the date of foreclosure to the successor's employees following the foreclosure, despite the fact that the predecessor had "shed several employees" in the few months leading up to the foreclosure).

16.   Evidence at trial established that there was a substantial continuity of personnel between GATT and Interline. *Findings of Fact* ¶¶ 54-60. All of Interline's initial hires were former GATT employees and none of these individuals had to go through a formal application process before being hired by Interline. *Findings of Fact* ¶¶ 54-55, 58. The majority of employees at both GATT and Interline were call center agents and performed essentially the same job function at both companies. *Findings of Fact* ¶ 59. For at least

four years after the foreclosure sale, a majority of Interline's employees had previously worked for GATT. *Findings of Fact* ¶ 60.

> ### iii.    The Facts Establish Continuity of Physical Location Between GATT and Interline

17.    Evidence at trial established a continuity of physical location between GATT and Interline. *Findings of Fact* ¶¶ 61-68. In Austin, Texas, the hub of both GATT's and Interline's operations, Interline operated, for seven months following the foreclosure sale, out of a portion of the space that GATT had been leasing prior to the foreclosure sale. During those seven months, Interline did not use any space that had not been used by GATT prior to the foreclosure sale. Additionally, although Interline occupied only a portion of the space GATT was leasing at the time of the foreclosure sale, GATT had been scaling back its operations prior to the foreclosure sale and, at the time of the foreclosure, was not using all of its leased space. *Findings of Fact* ¶¶ 61-64. Interline also operated out of the same small Florida office for more than five years following the foreclosure sale that GATT had been using at the time of the foreclosure. *Findings of Fact* ¶¶ 65-67.

> ### iv.    The Facts Establish Continuity of Assets Between GATT and Interline

18.    Evidence at trial established that there was a continuity of assets between GATT and Interline. *Findings of Fact* ¶¶ 69-81. Interline used substantially the same office equipment, furniture, computers, and office systems as GATT; benefited from GATT's contracts with vendors and utility companies until it could negotiate new contracts; and continued to run an interline travel business using the same customer list, phone numbers, emails, and website as GATT. *Findings of Fact* ¶¶ 73-80, 104.

41

19.     Evidence at trial also established that there was some continuity of liabilities between
        GATT and Interline. *Findings of Fact* ¶¶ 82-85. Assumption of a predecessor's liabilities
        is one element that can be considered when assessing continuity of assets between
        companies. *Call Ctr.*, 635 F.3d at 54 (stating that evidence that "Interline assumed
        several of GATT's liabilities in addition to acquiring its assets" is a consideration in the
        continuity of assets factor). Although Interline did not expressly assume any of GATT's
        liabilities at the foreclosure sale, the company implicitly assumed some of GATT's
        liabilities by recognizing vacation time that former GATT employees had accrued while
        working at GATT as a loss from the foreclosure sale, giving discounts to GATT
        customers who had lost deposits, and paying the preexisting vacation reservation for one
        GATT customer. *Findings of Fact* ¶¶ 82-85.

           **v.    The Facts Establish Continuity of Business Operations Between
                   GATT and Interline**

20.     The plaintiff does not need to show that Interline's operations were identical to GATT's,
        nor that Interline continued all of GATT's operations. *Mavel*, 509 F. Supp. 2d at 189;
        *Wells Fargo*, 2011 WL 1225986, at *20 (focusing on whether the successor was engaged
        in the "same core business" as the predecessor and discussing that a fact finder could find
        continuity of business operations despite differences in the companies' operations).

21.     Comparing GATT's operations just prior to the foreclosure sale to Interline's operations
        immediately following the sale, the evidence at trial established that there was a
        continuity of business operations between GATT and Interline. *Findings of Fact*
        ¶¶ 86-108. Both companies were primarily in the business of selling travel to interliners.
        *Findings of Fact* ¶¶ 86, 89-98, 103. This similarity is highlighted by the fact that Interline
        was able to continue selling travel services to interliners beginning the day after the

foreclosure sale, using phone numbers, a website, and general business operations that had been operated by GATT, without any meaningful break in service from the viewpoint of a perspective interline customer or an employee. *Findings of Fact* ¶¶ 73-76, 86-108.

### vi. The Purpose of Forming Interline Supports a Finding of Successor Liability

22.    In order to determine the purpose of forming Interline, the Court looks generally at the circumstances surrounding Interline's creation, rather than the specific avenue used to acquire GATT's assets. *S. Conn. Gas Co. v. Waterview of Bridgeport Ass'n*, No. CV054005335, 2006 WL 1681005, at *2 (Conn. Super. Ct., June 1, 2006) (stating that "it is the duty of the court to examine the substance of the transaction to ascertain its purpose and true intent") (citations and internal quotation marks omitted); *see also Fall River Dyeing and Fishing Corp. v. N.L.R.B.*, 482 U.S. 27, 44 n. 10 (1987) (finding that petitioner's company "was formed with the express purpose of acquiring [respondent's] assets . . . [and that] so long as there are other indicia of 'substantial continuity,' the way in which a successor obtains the predecessor's assets is generally not determinative of the 'substantial continuity' question") (citations omitted).

23.    The Court has not considered the fraud theory of successor liability as that issue was resolved on summary judgment by Judge Squatrito and affirmed by the Second Circuit. *See Conclusions of Law* ¶ 7. The Court does note, however, that there is no indication in the record that Boyd or Fleischman were acting in pursuit of any motive other than to protect and possibly recoup their investment in Call Center when they formed Interline. As mandated by the Second Circuit, the relevant "purpose" inquiry is whether Interline was formed for the purpose of acquiring GATT's assets, not whether such a purpose was lawful. *See Call Ctr.*, 635 F.3d at 54-55.

24.    Evidence at trial established that the purpose of forming Interline and conducting the foreclosure sale was to obtain GATT's assets and continue its core interline travel sales operations. *Findings of Fact* ¶¶ 109-11.

   **d.    Interline Cannot Succeed on a Defense of Laches Because it Has not Shown that Call Center Unreasonably Delayed Pursuing its Remedies**

25.    To prevail on a defense of laches, a defendant must show that "(1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998); *see also Batiste v. City of New Haven*, 239 F. Supp. 2d 213, 225 (D. Conn. 2002).

26.    Interline asserts that Call Center failed to perfect its security interest in the equipment that was the subject of its contract with GATT or repossess the equipment after it became aware of a dispute between GATT and Call Center over whether the equipment conformed to the sale agreement. [Rec. Doc. 345, at 29]. Interline asserts further that had Call Center done this, Interline would have known about Call Center's claim against GATT before the foreclosure sale and could have dealt with the claim as it did with the claims of secured creditors such as Wells Fargo. [Rec. Doc. 345, at 30-32],

27.    Interline sets out several factual allegations in its post-trial brief which it alleges the Court prevented it from introducing at trial and which it further alleges are related to its defense of laches. [Rec. Doc. 345, at 29-32]. Assuming arguendo all the facts Interline sets out in its post-trial brief to be true, the Court finds that Interline could still not succeed in its defense of laches. There have been no allegations that Call Center was aware of the defendant's conduct in causing the foreclosure sale or even of Interline's existence prior to or at the time of the foreclosure sale. The evidence at trial established

that, to the contrary, Call Center only learned about Interline after it filed suit against GATT and that it added Interline as a party defendant within weeks of learning of Interline's existence and of the October 2001 foreclosure sale. *Findings of Fact* ¶¶ 112-14. Additionally, the record of the case indicates that plaintiff's claims were all filed within the relevant statute of limitations. While not dispositive, "[w]hen a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period." *Ikelionwu*, 150 F.3d at 238. Interline did not establish that plaintiff inexcusably delayed in adding Interline as a defendant. Based on Call Center's lack of knowledge about the defendant's actions in causing the foreclosure sale at the time it occurred and the absence of any indication of inexcusable delay on Call Center's part, the Court finds that defendant has failed to establish that laches bars plaintiff's claim as it relates to successor liability under the continuity of enterprise theory of successor liability.

## VII.   Conclusion

The Court finds that the balance of factors to be considered in the continuity of enterprise theory of successor liability tips overwhelmingly in the plaintiff's favor. Plaintiff has proven that Interline is liable under the continuity of enterprise theory of successor liability by a preponderance of the evidence and has shown that there was a continuity of enterprise between GATT and Interline at or near the time of the foreclosure sale on October 30, 2001.

The underlying breach of contract claim currently pending in Connecticut state court, in which Interline has successfully intervened,[26] will decide the monetary dispute between the parties and determine what damages, if any, are due Call Center as a result of Interline's successor liability. The Court did not entertain evidence as to damages and will not enter a

---

[26] *See infra Rulings on Issues Raised in Pre-Trial Briefs: Defenses*, at 5-8.

money judgment as the only issue squarely before it at trial was successor liability based on the

continuity of enterprise theory of successor liability, which is a cause of action in equity and not

at law. The Court will defer entering judgment on its ruling pending the entry of a final judgment

in Civil Action No. DBD-CV02-0346965-S of the docket of the Superior Court, Judicial District

of Danbury, Connecticut.[27]

_____
Tucker L. Melançon
United States District Judge

March 5, 2014
Bridgeport, CT

_____

[27] *See infra Prologue*, at 2-3 n.1.